UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

EDWARD MICHAEL SHAIEB,

           Petitioner,                Case No. 1:05-cv-756

v.                                  Honorable Robert Holmes Bell

MARY BERGHUIS,

           Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in two consolidated cases, Petitioner was convicted of one count of first-degree criminal sexual conduct (CSC) involving a victim younger than thirteen years of age, MICH. COMP. LAWS § 750.520b(1)(a), and three counts of second-degree CSC involving a victim younger than thirteen years of age, MICH. COMP. LAWS § 750.520c(1)(a). On January 18, 2001, the trial court sentenced Petitioner to concurrent prison terms of nine to twenty years for the first-degree CSC conviction and five to fifteen years for each of the second-degree CSC convictions. (Sentencing Transcript (S. Tr.), 55-57, docket #37.) On August 22, 2001, however, the Macomb County Circuit Court re-sentenced Petitioner to concurrent prison terms of eight to twenty years for the first-degree CSC conviction and five to fifteen years for each of the second-degree CSC convictions. (Resentencing Transcript (R. Tr.), 19-20, docket #39; Pet'r's Br. in Supp. of Pet. at 4 n.7, docket #2.) In his *pro se* petition, Petitioner raises eight grounds for relief, as follows:

    I.        THE PROSECUTOR VIOLATED PETITIONER'S FIFTH AMENDMENT
                RIGHTS BY IMPROPERLY COMMENTING ON PETITIONER'S PRE-

AND POST-ARREST SILENCE, INCLUDING HIS DECISION NOT TO TESTIFY AT TRIAL;

II.    THE PROSECUTOR VIOLATED PETITIONER'S FOURTEENTH AMENDMENT RIGHTS BY IMPROPERLY COMMENTING ON PETITIONER'S PRE- AND POST- ARREST SILENCE, INCLUDING HIS DECISION NOT TO TESTIFY AT TRIAL;

III.    PETITIONER'S CONVICTION SHOULD BE REVERSED UNDER THE FOURTEENTH AMENDMENT BECAUSE PETITIONER WAS CONVICTED ON INSUFFICIENT EVIDENCE;

IV.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE COUNSEL FAILED TO ARGUE THAT MS. SLICKER WAS THIRTEEN YEARS OLD AT THE TIME OF THE ALLEGED CRIME;

V.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL BECAUSE THEY FAILED TO MOVE FOR A NEW TRIAL;

VI.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL BECAUSE COUNSEL FAILED TO SEEK A REMAND TO EXPAND THE TRIAL RECORD REGARDING THE INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENTS;

VII.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL BECAUSE THEY FAILED TO SUFFICIENTLY ARGUE A FOURTEENTH AMENDMENT VIOLATION WHEN THE PROSECUTOR USED PETITIONER'S SILENCE, AFTER HIS ARREST AND RECEIVING *MIRANDA* WARNINGS, AS EVIDENCE IN THE TRIAL; AND

VIII.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL BECAUSE THEY DID NOT ARGUE THAT PETITIONER'S FIFTH AMENDMENT RIGHT AGAINST SELF INCRIMINATION WAS VIOLATED WHEN THE PROSECUTOR REFERRED TO PETITIONER'S SILENCE DURING THE TRIAL IN HER CLOSING ARGUMENT[S].

(Pet'r's Br. in Supp. of Pet. at 15, 34, 49-50, docket #2.)

Respondent filed an answer to the petition (docket #15) stating that the grounds should be denied because Petitioner's claims are procedurally defaulted or without merit. On May 12, 2008, Petitioner filed a motion, memorandum and brief for leave to expand the record (docket ##46-48) with additional information regarding the necessity of an evidentiary hearing for Petitioner's ineffective assistance of counsel claims. The Court granted Petitioner's motion by order dated January 26, 2009 (docket #50). Upon review and applying the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA) standard, I find that the issues raised in the petition are without merit. Accordingly, I recommend that the habeas petition be denied.

## I.  Procedural History

### A.      Trial Court Proceedings

The state prosecution arose from Petitioner's alleged sexual assault of two of his daughter's friends, Mariana Slicker and Nicole Jacobs, during sleep-overs at Petitioner's house between the fall of 1993 and the spring of 1994, when the victims were both under thirteen years old. As to Mariana Slicker, Petitioner was charged with one count of first-degree CSC involving a victim under thirteen years of age, MICH. COMP. LAWS § 750.520b(1)(a), and one count of second-degree CSC involving a victim under thirteen years of age, MICH. COMP. LAWS § 750.520c(1)(a). As to Nicole Jacobs, Petitioner was charged with two counts of second-degree CSC involving a victim under thirteen years of age, MICH. COMP. LAWS § 750.520c(1)(a).

Following a preliminary examination on March 10, 1999, Petitioner was bound over on one first-degree CSC charge for the sexual penetration, to wit finger in the vagina, of Mariana Slicker, one second-degree CSC charge for the inappropriate touching of Mariana Slicker's body and two second-degree CSC charges for the inappropriate touching of Nicole Jacobs' body. (Mar.

10, 1999 Prelim. Examination Hrg. at 14, 20, 54, 86-87, docket #19.)  Petitioner was tried before a jury for several days between October 17 and December 8, 2000.[1]

The prosecution called Mariana Slicker, a victim, as its first witness.  (Tr. II, 22.) Mariana testified that she was eighteen years old at the time of the trial.  (Tr. II, 23.)  Mariana was born on February 6, 1982.  (Tr. II, 23.)  During elementary school and junior high, Mariana was friends with classmates Lindsey Shaieb and Nicole Jacobs.  (Tr. II, 24-25.)  Specifically, Mariana became friends with Lindsey in the third grade.  (Tr. II, 24-25.)

On October 15, 1993, Mariana spent the night with Lindsey at Lindsey's home. (Tr. II, 27-28, 31.)  Petitioner and his wife, Mary Shaieb, were also home.  (Tr. V, 19-20.)  At that time, Mariana was eleven years old.  (Tr. II, 32.)  Mariana slept in Lindsey's bed during sleep-overs. (Tr. II, 31.)  Lindsey's bed was situated so that someone could climb in or out either side of the bed. (Tr. II, 33.)  Around 11:30 pm or 12:00 am, Lindsey and Mariana went to bed.  (Tr. II, 30-31.) Mariana wore a T-shirt, boxers and underwear to bed.  (Tr. II, 32.)  Mariana covered herself with a sheet and a bedspread in Lindsey's bed.  (Tr. II, 34.)  That evening, Lindsey's bedroom door was open just a crack.  (Tr. IV, 96.)

---

[1] Transcripts from the trial will be numbered I through XI as follows:

Transcript of October 17, 2000, docket #22 (Tr. I);
Transcript of October 18, 2000, docket #23 (Tr. II);
Transcript of October 19, 2000, docket #25 (Tr. III);
Transcript of November 28, 2000, docket #26 (Tr. IV);
Transcript of November 29, 2000, docket #27 (Tr. V);
Transcript of November 30, 2000, docket #28 (Tr. VI);
Transcript of December 1, 2000, docket #29 (Tr. VII);
Transcript of December 5, 2000, docket #30 (Tr. VIII);
Transcript of December 6, 2000, docket #32 (Tr. IX);
Transcript of December 7, 2000, docket #34 (Tr. X); and
Transcript of December 8, 2000, docket #35 (Tr. XI).

Early in the morning, Mariana awoke when Lindsey's bedroom door was pushed open and the hallway light shone into Lindsey's bedroom. (Tr. IV, 96-98.) Mariana opened her eyes a little bit. (Tr. II, 34.) She recognized Petitioner in the hallway light. (Tr. II, 35.) Mariana did not remember the light being on when they went to bed. (Tr. IV, 96.) Mariana did not speak to Petitioner when he walked into the room. (Tr. II, 35.) She thought that maybe he was checking on them or grabbing a blanket. (Tr. II, 35.)

Petitioner walked into the room, and pulled down the bedspread and the sheet covering Mariana. (Tr. II, 34-37.) All of Mariana's body was uncovered except her calves and feet. (Tr. II, 37.) Lindsey was not uncovered. (Tr. V, 51.) Mariana was lying on her stomach, facing Lindsey and pretending to be asleep. (Tr. II, 37-39.) Petitioner reached under Mariana's boxers and underwear and placed his hand on Mariana's buttocks. (Tr. II, 38.) Mariana testified that "[Petitioner] kind [of] just rubbed my butt a little bit" until she flinched. (Tr. II, 37-38.) Once she moved, Petitioner walked out of the room. (Tr. II, 39.) Mariana watched Petitioner as he left the room. (Tr. II, 41.)

After Petitioner left the room, Mariana glanced at the clock and at Lindsey to see if she was awake. (Tr. II, 39.) Lindsey was still sleeping. (Tr. II, 40.) The time on the clock was 5:35 am. (Tr. II, 40.) Mariana thought of calling her mother. (Tr. II, 40.) At some point, Mariana fell back to sleep. (Tr. IV, 102.) When Lindsey and Mariana woke up the next morning, Mariana did not mention to Lindsey or Mrs. Shaieb what had happened. (Tr. II, 41-42.) Eventually, Mariana's dad picked Mariana up to go to her grandparents' home. (Tr. II, 42.)

At her grandparents' home, Mariana's older sister, Nicole Slicker, walked in on Mariana while she was getting ready. (Tr. II, 42-43.) Mariana was crying and shaking. (Tr. II, 43.)

"[Nicole] just asked me what was wrong and I just said that when [I] was [] at Lindsey's house, Mr. Shaieb had touched me." (Tr. II, 43.) Mariana, however, requested that her sister keep it a secret from their mother because she was scared. (Tr. II, 43-44.)

After the October 15, 1993 incident, Mariana continued to sleep-over at Lindsey's house. (Tr. IV, 85.) In the spring of 1994, Mariana was twelve years old when she spent the night at Lindsey's house again. (Tr. II, 45-46.) Petitioner was not home when Mariana first arrived. (Tr. II, 46.) Mariana and Lindsey went to bed between 11:00 pm and 12:00 am. (Tr. II, 47.) They slept in Lindsey's room. (Tr. II, 47.) The position of Lindsey's bed was different this time because it was against a wall. (Tr. II, 47-49.) Mariana slept next to the wall in a T-shirt, boxers and underwear. (Tr. II, 49, 53.) Mariana remembered that the Shaieb's were redecorating Lindsey's bedroom at that time. (Tr. II, 50.) Because they were painting around Lindsey's bedroom window, Lindsey had a sheet over the window. (Tr. II, 50.) That night, Mariana suggested that they sleep downstairs because she did not think that Petitioner would do anything if they slept downstairs. (Tr. II, 50-51.) Lindsey's mother, however, said that they should sleep in Lindsey's room. (Tr. II, 51.) The door to Lindsey's room was slightly open that night. (Tr. II, 52.)

Mariana eventually fell asleep but woke up when Petitioner opened Lindsey's door and the hallway light shone into the room. (Tr. II, 52.) Mariana was laying on her back and pretending to be asleep. (Tr. II, 53.) Mariana was covered by a sheet. (Tr. II, 52.) Petitioner reached over Lindsey and pulled the sheet off of Mariana's chest. (Tr. II, 52-54.) Petitioner then touched Mariana's chest under her T-shirt. (Tr. II, 54.) Specifically, Petitioner placed his hand on Mariana's breasts and began rubbing them. (Tr. II, 54-55.) Next, Petitioner moved his hand down Mariana's underwear and boxers. (Tr. II, 55-56.) Mariana testified that "[Petitioner] put his finger

in [her] vagina." (Tr. II, 56.) Petitioner inserted his finger completely into Mariana's vagina. (Tr. II, 56.) Petitioner did not have his finger in Mariana's vagina for very long because Mariana turned to face Lindsey. (Tr. II, 57.) Petitioner then ran out of Lindsey's room. (Tr. II, 57.) He went to a bathroom and flushed the toilet. (Tr. II, 57.) Soon thereafter, Petitioner came back to the doorway of Lindsey's room and looked around. (Tr. II, 58-59.) After that incident, Mariana was shaking. (Tr. II, 59.) She did not know what to do. (Tr. II, 59-60.) She looked at the clock and noticed that it was between 4:30 am and 5:30 am. (Tr. II, 60.)

Once again, Mariana did not mention this incident to anyone, including her mother, because she was scared and ashamed. (Tr. II, 60-61.) Because Petitioner had done more to her, Mariana did not tell her sister, Nicole Slicker, about the second incident. (Tr. II, 60-61.) She also did not speak of Petitioner's actions in several letters that she wrote to Lindsey. (Tr. V, 25-33, 37.) Further, Mariana did not confide in a health care professional or her school teachers about either of the incidents. (Tr. V, 72-74.)

In the sixth grade, Mariana finally approached her mother about the first incident. (Tr. II, 61.) Mariana's sister, Nicole, was also present during the conversation. (Tr. II, 61.) Mariana, however, did not tell her mother about the second incident because she was scared. (Tr. II, 61.)

Even after the second incident and the disclosure to her mother, Mariana still slept over at Lindsey's house. (Tr. II, 62.) Mariana did not want to lose her best friend. (Tr. II, 62.) At that time, Petitioner was not living in the house because Petitioner and Lindsey's mother were separated. (Tr. II, 62.) After six months, Petitioner and Lindsey's mother reconciled and the family moved from Sterling Heights to Rochester before Lindsey started the eighth grade. (Tr. II, 63-64.)

Mariana slept over at the Shaieb's new home in Rochester twice. (Tr. II, 63.) The first time several girls spent the night and they all stayed up the entire night. (Tr. II, 63.) On the second occasion, Mariana and Lindsey slept in the basement. (Tr. II, 63.) While in Rochester, Mariana told Lindsey that Mariana's cousin's uncle inappropriately touched her while she was at a sleep-over. (Tr. IV, 103.) Mariana made up the story to see if Lindsey would open up about her father. (Tr. IV, 103-04.) Lindsey, however, did not disclose anything. (Tr. IV, 103-04.) If Lindsey had said that it had happened to her too, then Mariana would have told her about Petitioner. (Tr. IV, 103.)

Since 1990, Mariana had been seeing a counselor. (Tr. IV, 68-69.) She was treated for depression, verbal and physical abuse by her stepfather, and school problems. (Tr. II, 65; Tr. IV, 73; Tr. V, 20, 40-42.) Mariana did not tell her first counselor about Petitioner because she did not trust that counselor. (Tr. V, 44-45.) When Mariana was twelve or thirteen years old, she stopped going to counseling. (Tr. V, 45.)

After trying to commit suicide, Mariana started to see another counselor, Jeannette Stimson, when she was sixteen years old, in February 1998. (Tr. V, 46-49.) During her first counseling session, Mariana told Ms. Stimson about Petitioner because she felt comfortable with Ms. Stimson. (Tr. V, 47-48, 74.) Mariana's mother was also present during the first meeting with Ms. Stimson. (Tr. V, 48.) As a result, Mariana told her mother about the second incident for the first time. (Tr. II, 65; Tr. V, 48.) Ms. Stimson did not call the police, but left that decision with Mariana and her mother. (Tr. V, 18.)

Initially, Mariana did not report Petitioner to the police because she was scared. (Tr. II, 66.) In March 1998, however, Mariana and Nicole Jacobs and their parents met with Officer

Aaron Burgess at Mariana's house. (Tr. II, 67-68.) Mariana spoke with Officer Burgess alone and then wrote a statement about what happened. (Tr. II, 67-68.) Mariana never discussed the allegations with Nicole Jacobs. (Tr. II, 75; Tr. V, 50.) Shortly thereafter, Mariana met with Detective Linda Deprez. (Tr. IV, 82-83.) During that meeting, Mariana clarified the dates of the incidents. (Tr. IV, 82-83.) The first incident occurred on October 15, 1993. (Tr. IV, 82.) She remembered the first incident because of her half-brother's birthday. (Tr. II, 27; Tr. IV, 83.) The second incident occurred in the spring of 1994. (Tr. IV, 83.) Mariana remembered the second incident because they were redecorating Lindsey's room. (Tr. IV, 83.)

Nicole Jacobs, the second victim, testified that she was eighteen years old at the time of the trial. (Tr. V, 84.) Nicole was born on May 23, 1982. (Tr. V, 84.) Nicole had been friends with Lindsey Shaieb and Mariana Slicker since the third grade. (Tr. V, 84-85.) On several occasions between October 1993 and February 1994, Nicole slept over at Lindsey's house. (Tr. V, 88.) On one such occasion, something unusual happened during a sleep-over. (Tr. V, 88.) Nicole was in the sixth grade and eleven years old at that time. (Tr. V, 88-89.) Nicole and Lindsey slept in Lindsey's bedroom. (Tr. V, 91.) Nicole remembered a sheet over Lindsey's window but did not know if they were redecorating Lindsey's room between October 1993 and February 1994. (Tr. V, 93; Tr. VI, 75-76.) Lindsey's bed was positioned so that you could walk around to either side. (Tr. V, 93.) Nicole wore a T-shirt, boxers and underwear to bed. (Tr. V, 97.) When Nicole and Lindsey went to bed, the door to Lindsey's room was cracked open. (Tr. V, 99.) There were no lights on. (Tr. V, 99.)

Nicole woke up when she heard Lindsey's door open and someone walk into Lindsey's room. (Tr. V, 99.) At this point, Nicole was laying on her side, facing Lindsey and the

door.  (Tr. V, 100, 102.)  Nicole did not know the person who entered the room until he walked out of the room.  (Tr. V, 100.)  At that time, she opened her eyes and recognized Petitioner.  (Tr. V, 100.)  When Petitioner came into the room, he walked over to Nicole's side of the bed and started caressing her buttocks.  (Tr. V, 101-02.)  Nicole was covered with a sheet and bedspread.  (Tr. V, 98, 101.)  Petitioner never uncovered Nicole.  (Tr. V, 105.)  Rather, he caressed her buttocks over the sheet and bedspread.  (Tr. V, 101.)  When Nicole pretended to wake up, Petitioner walked out of the room.  (Tr. V, 102.)  Nicole never said anything to Petitioner.  (Tr. V, 104.)  After Petitioner left the room, Nicole tried to go back to sleep.  (Tr. V, 106.)  She did not wake Lindsey up.  (Tr. V, 106.)  Eventually, Nicole fell back to sleep.  (Tr. V, 106.)  Nicole never told Lindsey what happened because she did not think Lindsey would believe her.  (Tr. V, 107.)  Nicole just wanted to forget about the incident.  (Tr. V, 107.)

About a month or so after the first incident, Nicole described a second incident at Lindsey's house.  (Tr. VI, 7-8, 12-13.)  Nicole was still in the sixth grade at the time of the second incident.  (Tr. VI, 8.)  Nicole and Lindsey slept in Lindsey's bed that night.  (Tr. VI, 9.)  The furniture in Lindsey's room had not been moved between the first and second incidents.  (Tr. VI, 9.)  Nicole wore a T-shirt, boxers and underwear to bed.  (Tr. VI, 13.)  Nicole slept under one sheet.  (Tr. VI, 13.)  Nicole was not sure if the door to Lindsey's room was open or closed when they went to bed.  (Tr. VI, 14.)  During the night, Nicole heard someone come into the room.  (Tr. VI, 14-15.)  Nicole pretended to be asleep.  (Tr. VI, 14-15.)  That person walked over to Nicole's side of the bed and began touching her buttocks over the sheet.  (Tr. VI, 15-16, 19, 27.)  When Nicole moved a little, that person left the room.  (Tr. VI, 17.)  Nicole was laying on her right side, facing Lindsey and the door.  (Tr. VI, 17.)  Nicole opened her eyes as that person was walking out of the room.  (Tr.

VI, 18.)  She recognized Petitioner.  (Tr. VI, 18.)  After Petitioner left the room, Nicole tried to go to back to sleep.  (Tr. VI, 20.)  Nicole did not discuss the incident with anyone because she was afraid.  (Tr. VI, 20-21.)

Nicole testified that her mother confronted her after watching a TV program on sexual assault.  (Tr. VI, 21-22.)  Nicole's mother asked Nicole if anything similar had happened to her.  (Tr. VI, 21-22.)  Nicole answered negatively.  (Tr. VI, 21-22.)  Nicole just wanted to forget about both of the incidents.  (Tr. VI, 22, 73-74.)  Nicole was in the seventh grade when her mother confronted her about the TV program.  (Tr. VI, 22.)

In the tenth grade, Nicole's mother confronted her about Petitioner.  (Tr. V, 108-09; Tr. VI, 22.)  Nicole's mother told Nicole that she ran into Mariana Slicker's mother at the store.  (Tr. V, 108-09.)  When Nicole's mother mentioned that Petitioner had touched Mariana, Nicole broke down and started crying.  (Tr. V, 109.)  Nicole then told her mother what had happened.  (Tr. V, 109.)  Nicole did not tell her mother prior to that day because she was in denial about both of the incidents.  (Tr. V, 109.)  Nicole had no idea that this had happened to Mariana until that day.  (Tr. VI, 22.)  Nicole never discussed the case with Mariana.  (Tr. V, 110; Tr. VI, 77.)  During the trial, however, Nicole testified that she learned of Mariana's allegations by reading a police report.  (Tr. VI, 57-60.)

Nicole and her mother met with Officer Aaron Burgess at Mariana's home to discuss the allegations on March 8, 1998.  (Tr. V, 110; Tr. VI, 67.)  Officer Burgess met with Nicole and Mariana separately.  (Tr. VI, 87-88.)

A week later, Nicole spoke with Detective Linda Deprez at the police department.  (Tr. VI, 31.)  During that meeting, Nicole talked about dreaming that the sexual assaults had

occurred. (Tr. VI, 32.) Nicole explained that she wanted to believe it was a dream because she did not want to think that it could happen. (Tr. VI, 32.) Nicole testified, however, that she knew, in fact, it was not a dream. (Tr. VI, 32.) At her interview, Nicole also first came out with the dates of the incidents: October 1993 to February 1994. (Tr. VI, 69.) Nicole testified that she did not know of the dates of Mariana's incidents. (Tr. VI, 69.) She also never discussed dates with Mariana Slicker. (Tr. VI, 83.) She figured out the time period because she knew that it happened in the sixth grade. (Tr. VI, 82-83.)

Nicole still slept over at Lindsey's house after the two incidents and after Lindsey moved to Rochester before the eighth grade. (Tr. VI, 34-36.) She did not want to lose her best friend. (Tr. VI, 35.) After Lindsey moved, Nicole did not see Lindsey or Mariana as much. (Tr. VI, 46.) Once Nicole told her mother about the incidents, Nicole never went back to Lindsey's house. (Tr. VI, 36.) Nicole was in the tenth grade when she told her mother about Petitioner. (Tr. V, 108-09.)

Debra Jacobs testified that she is Nicole Jacobs' mother. (Tr. VI, 88.) Debra has two other children besides Nicole. (Tr. VI, 112-13.) The Jacobs' family used to live within walking distance of Petitioner's house in Sterling Heights. (Tr. VI, 90.) Debra knew the Shaieb family and the Slicker family through Nicole because all of the girls attended the same school. (Tr. VI, 90.) Nicole was close to both Mariana Slicker and Lindsey Shaieb. (Tr. VI, 115.) Many times, Nicole would spend the night at Lindsey's house. (Tr. VI, 91.) Nicole never mentioned any problems at Lindsey's house. (Tr. VI, 92.) However, Debra knew that Petitioner and his wife were having marital problems. (Tr. VI, 92.)

Debra spoke with Mariana's mother, Sandy Sklar, on several occasions. (Tr. VI, 94.) When Nicole was in the seventh grade, Sandy shared some shocking news with Debra in regards to the Shaieb family. (Tr. VI, 95-96.) Debra told Sandy that she would talk with Nicole about the news. (Tr. VI, 95-96.) After Nicole came home from school, Debra fabricated a story about a TV program concerning child molestation and asked Nicole if anything had ever happened to her. (Tr. VI, 96.) Debra made up the story to see if Nicole would open up. (Tr. VII, 16.) Nicole did not open up. (Tr. VI, 96.) Debra did not ask Nicole any more questions. (Tr. VI, 96.) After Debra questioned Nicole about the fabricated TV show, she still allowed Nicole to go to Petitioner's home. (Tr. VII, 22.) At that time, Petitioner was no longer living at his house because he and his wife were separated. (Tr. VI, 103-04.) When Petitioner and his wife reconciled, Nicole still spent the night at Petitioner's home in Sterling Heights and later in Rochester. (Tr. VI, 120.)

In February 1998, Debra ran into Sandy Sklar again at a school function. (Tr. VI, 97, 122.) At that time, Sandy shared additional information regarding Petitioner with Debra. (Tr. VI, 97.) The next day, Debra talked to Nicole when she came home from school. (Tr. VI, 98.) Debra mentioned that she ran into Mariana's mother, who told her that Petitioner had touched Mariana. (Tr. VI, 98.) Debra testified that Nicole started to cry. (Tr. VI, 98.) Debra asked "[w]hat did he do to you?" (Tr. VI, 98.) Nicole replied that Petitioner had come into the bedroom and touched her butt. (Tr. VI, 99.) Debra then inquired why Nicole never told her. (Tr. VI, 99.) Nicole stated that she thought she was dreaming. (Tr. VI, 99.) Debra, however, knew that Nicole was not dreaming because Nicole told her that she saw Petitioner walk out of the room. (Tr. VI, 99.) Debra decided to press charges. (Tr. VI, 100.) Nicole never returned to Petitioner's home after February 1998. (Tr. VI, 104.)

Nicole and her parents eventually met Officer Aaron Burgess at Mariana's house. (Tr. VI, 106-07, 124.) Nicole was very emotional during the meeting. (Tr. VI, 107.) They also met with Detective Linda Deprez at the police department a couple days later. (Tr. VI, 109.) Once again, Nicole was very emotional. (Tr. VI, 110.) Because Nicole was so upset, Debra had to schedule a second interview with Detective Deprez. (Tr. VI, 111, 130-31.)

Nicole Slicker, Mariana's older sister, testified next for the prosecution. (Tr. VII, 25-26.) In October 1993, Nicole and Mariana Slicker and other family members celebrated Mariana's half-brother's birthday at Mariana's grandmother's house. (Tr. VII, 28, 41.) Prior to the celebration, Mariana's mother picked up Mariana from a sleep-over at Lindsey Shaieb's house. (Tr. VII, 31-32, 41-42.) Nicole noticed that Mariana was acting differently that morning. (Tr. VII, 34-35.) Mariana was unusually quiet. (Tr. VII, 34-35.) Since Mariana was running late that morning, Mariana decided to get ready at her grandmother's house. (Tr. VII, 29.) While Mariana was taking a shower, Nicole knocked on the door to use the bathroom. (Tr. VII, 30.) Upon entering the bathroom, Nicole could hear Mariana crying in the shower. (Tr. VII, 31.) It was just the two of them in the bathroom. (Tr. VII, 31.) Nicole asked Mariana what was wrong. (Tr. VII, 31.) After Mariana confided in Nicole, Nicole told Mariana to tell their mother and to avoid going to the Shaieb's home again. (Tr. VII, 31-32.) Mariana asked Nicole not to say anything. (Tr. VII, 31-32.) Nicole never mentioned the incident to her mother. (Tr. VII, 32-33.) On at least one occasion, Nicole remembered that Mariana slept over at Lindsey Shaieb's house after she told Mariana not to go to the Shaieb's home. (Tr. VII, 48.) Nicole never informed anyone about Mariana's disclosure until March 1998. (Tr. VII, 50.)

Sandy Sklar testified that she is Mariana and Nicole Slicker's mother. (Tr. VII, 59.) Due to Sandy's ex-husband's physical abuse of Mariana, Sandy sent Mariana to therapy. (Tr. VII, 65-66.) Mariana saw a therapist, Judy Moon, for one-on-one therapy sessions until December 1997. (Tr. VII, 68-69.) Although Mariana had disclosed something to Sandy in regards to Petitioner in the fall of 1994, Sandy did not inform Ms. Moon or go to the police because Sandy was preoccupied with other problems at home. (Tr. VII, 75-76, 120, 127.) In February 1998, Mariana started to see another therapist, Jeanette Stimson, because Judy Moon left the clinic. (Tr. VII, 70-71.) Sandy attended Mariana's first session with Ms. Stimson. (Tr. VII, 71.) At that session, Mariana revealed what had happened at the Shaieb's home. (Tr. VII, 73-74.)

Sandy initially forbade Mariana to go to Lindsey Shaieb's house. (Tr. VII, 76.) Sandy also spoke with Debra Jacobs about the incident. (Tr. VII, 76.) Based on what she learned from Debra, she thought that it would be Mariana's word against Petitioner's word. (Tr. VII, 77.) Eventually, Sandy allowed Mariana to sleep-over at the Shaieb's house when Petitioner and Mrs. Shaieb were separated. (Tr. VII, 78.) Petitioner no longer lived at the home during that time. (Tr. VII, 78.) Petitioner and Mrs. Shaieb reconciled shortly before they moved to Rochester Hills. (Tr. VII, 78.) Sandy also permitted Mariana to sleep-over at Lindsey's at the house in Rochester Hills once or twice because Mariana missed Lindsey and would beg to see her. (Tr. VII, 79-80, 97.)

Starting in 1997, Sandy noticed that Mariana's mood changed. (Tr. VII, 99.) Mariana would not go out with friends and her grades had fallen. (Tr. VII, 98-99.) Mariana was depressed. (Tr. VII, 99-101.) At a counseling session in February 1998 with Ms. Stimson, Mariana discussed the second incident with Petitioner. (Tr. VII, 81.) Sandy also attended that counseling session. (Tr. VII, 81.) Over the next few weeks, Mariana and her parents pondered their options.

(Tr. VII, 82-83.)  At the end of February 1998, Sandy ran into Debra Jacobs at a school function and told her that it happened to Mariana a second time.  (Tr. VII, 83.)  The next night, Debra Jacobs called Sandy.  (Tr. VII, 84.)  Sandy learned that it also had happened to Nicole Jacobs.  (Tr. VII, 84.)  Nicole and her parents then came to Sandy's home to decide what to do.  (Tr. VII, 84.)  Eventually, Nicole's family and Mariana's family notified the police.  (Tr. VII, 86-87.)  The families did not attempt to coordinate their stories before the police arrived.  (Tr. VII, 88.)  Officer Aaron Burgess soon arrived at Mariana's home to interview everyone.  (Tr. VII, 87.)  Officer Burgess interviewed Mariana Slicker and Nicole Jacobs separately in the kitchen.  (Tr. VII, 88-89, 140.)

Aaron Burgess testified that he is a police officer with the Sterling Heights Police Department.  (Tr. VII, 145.)  Officer Burgess' responds to calls, obtains basic information and forwards that information to the detective bureau.  (Tr. VII, 162.)  At 5:30 pm on March 8, 1998, Officer Burgess responded to a call about criminal sexual conduct.  (Tr. VII, 147, 163.)  At the house, Officer Burgess found both sets of parents and the girls in the living room. (Tr. VII, 149.)  The parents were upset and the children were crying.  (Tr. VII, 151, 171.)  Officer Burgess interviewed Mariana, and then Nicole, separately in the kitchen.  (Tr. VII, 153-54, 157, 172-73.)  Once the interviews were finished, Officer Burgess had Mariana and Nicole fill out witness statements in the kitchen.  (Tr. VII, 154-55, 158.)  At that point, Officer Burgess specifically told them not to compare stories, just to write their own statement.  (Tr. VII, 158.)

Officer Burgess eventually prepared a report to turn over to the detective bureau. (Tr. VII, 157, 162-63, 167.)  After writing his report, Officer Burgess was no longer involved in the case.  (Tr. VII, 164.)  In his report, Officer Burgess wrote that both girls stated that Petitioner placed his hand down the back of their pajama bottoms and underwear to caress their buttocks.  (Tr. VII,

177-78.)  Officer Burgess reported that the assaults occurred in Lindsey Shaieb's bedroom with Lindsey sleeping in bed next to Mariana or Nicole.  (Tr. VII, 178.)  The girls pretended to be asleep while they were assaulted.  (Tr. VII, 178.)  Officer Burgess also wrote that both girls indicated that they did not tell their parents because they were afraid that no one would believe them.  (Tr. VII, 178.)  Officer Burgess finally noted that the dates reported by Mariana in her handwritten statement were inconsistent with the dates in his narrative report.  (Tr. VII, 181.)

Linda Deprez testified that she is a detective with the Sterling Heights Police Department.  (Tr. VII, 184-85.)  She has been assigned to the youth division for eight years.  (Tr. VII, 185, 195.)  As part of her duties in the youth division, Detective Deprez investigates sexual assaults involving children.  (Tr. VII, 239.)  She has been involved in over two hundred investigations.  (Tr. VII, 242.)

On March 9, 1998, Detective Deprez was assigned to this case.  (Tr. VII, 186.)  Ms. Deprez contacted both families to arrange interviews.  (Tr. VII, 189.)  On March 10, Nicole Jacobs came to the police station with her mother, but they both were extremely upset so they rescheduled the interview.  (Tr. VII, 191-92.)  Detective Deprez did not find it unusual that Nicole was upset considering the incident happened many years prior.  (Tr. VII, 199.)  Detective Deprez testified that children may delay reporting because they are afraid of the consequences and/or the perpetrator, and they don't think anyone will believe them.  (Tr. VII, 202.)    At the end of Nicole's interview, Detective Deprez instructed Nicole to pinpoint the dates of the incidents.  (Tr. VII, 192-93.)

On March 12, 1998, Detective Deprez met with Mariana Slicker and her mother at the police department.  (Tr. VII, 205-07.)  Detective Deprez also interviewed Mariana separately that day.  (Tr. II, 207.)  Mariana was crying and shaking during her interview.  (Tr. VII, 208.)  Detective

Deprez and Mariana discussed the inconsistencies in the dates between her statement and Officer Burgess' report. (Tr. VII, 211-12.) At that point, Mariana remembered her half-brother's birthday on October 15. (Tr. VII, 211, 267-68.) Detective Deprez noted that it is not uncommon for dates to be off, especially in a reporting delay. (Tr. VII, 212.) Mariana also remembered the date of the second incident as the spring of 1994 because Lindsey's room was being redecorated. (Tr. VII, 268.) She remembered a sheet over the window. (Tr. VII, 268.) Mariana finally clarified that Petitioner flushed the toilet after the second incident rather than the first incident. (Tr. VII, 212.)

On March 16, 1998, Detective Deprez interviewed Nicole Jacobs a second time. (Tr. VII, 217.) Nicole was upset and tearful. (Tr. VII, 217-18.) Nicole clarified several statements from Officer Burgess' report. (Tr. VII, 221.) First, Nicole clarified that Petitioner touched her buttocks on top of her clothing and the covers on two occasions between October 1993 and February 1994. (Tr. VII, 221, 274-75.) Second, Nicole stated that she had hoped that she had been dreaming but knew that she was awake. (Tr. VII, 221.) Nicole knew that she was not dreaming because she felt Petitioner's hand on her buttocks and saw Petitioner leave the room. (Tr. VII, 221-22.) After interviewing Nicole, Detective Deprez did not believe that Nicole was dreaming. (Tr. VII, 300-01.)

On March 23, 1998, Detective Deprez went to Petitioner's home. (Tr. VII, 225.) Only Mary and Lindsey Shaieb were home at that time. (Tr. VII, 226.) Detective Deprez gave Mary Shaieb an overview of what had happened with Mariana Slicker and Nicole Jacobs. (Tr. VII, 230.) Soon thereafter, Petitioner arrived home. (Tr. VII, 231.) Detective Deprez first advised Petitioner that there were allegations of inappropriate sexual behavior against Petitioner. (Tr. VII, 231.) Petitioner replied, "[n]o, no." (Tr. VII, 231-32.) Petitioner also turned to his wife and said "Mary, these allegations are not true." (Tr. VII, 247.) Detective Deprez then asked him why the girls would

make false allegations against him.  (Tr. VII, 231-32.)  Petitioner replied, "[s]trictly for the money."  (Tr. VII, 232.)  Prior to leaving, Detective Deprez asked Petitioner if he would come to the police station to make a statement.  (Tr. VII, 233.)  Petitioner stated that he wanted to clear things up.  (Tr. VII, 233.)  Detective Deprez never heard from Petitioner, Mary Shaieb or Lindsey Shaieb after that meeting.  (Tr. VII, 233.)  Detective Deprez later learned from Petitioner's lawyer that Petitioner would not be in for an interview.  (Tr. VII, 248.)

Lastly, the prosecution called Lindsey Shaieb as a hostile witness. (Tr. VIII, 9, 12.) At the time of the trial, Lindsey was eighteen years old.  (Tr. VIII, 12.)  Lindsey lived in Sterling Heights until she moved to Rochester, Michigan, in the eighth grade in September 1995.  (Tr. VIII, 13, 16.)  Lindsey became good friends with both Mariana Slicker and Nicole Jacobs in the third or fourth grade.  (Tr. VIII, 18, 74.)  It was common for Mariana and Nicole to sleep-over at Lindsey's house.  (Tr. VIII, 19, 75-76.)  From the third grade to the eighth grade, the girls slept over at Lindsey's house both individually and jointly.  (Tr. VIII, 20, 75.)  After Lindsey moved to Rochester, Mariana and Nicole each slept over one or two times.  (Tr. VIII, 21-22.)  Eventually, Lindsey grew apart from Mariana and Nicole.  (Tr. VIII, 23-24.)

If one person was sleeping over, that person would usually sleep in Lindsey's bedroom.  (Tr. VIII, 30.)  Otherwise, they would sleep in the family room.  (Tr. VIII, 30.)  When Nicole or Mariana slept over at Lindsey's house, they would sleep in Lindsey's bed and under the same sheets and comforters as Lindsey.  (Tr. VIII, 108-09.)  Typically, Lindsey slept with the hallway light on until the fourth or fifth grade.  (Tr. VIII, 109.)  After the fourth or fifth grade, Lindsey's older sister, Jeanette Shaieb, wanted the hallway light off.  (Tr. VIII, 77, 109.)  A hallway light was located outside of Lindsey's bedroom.  (Tr. VIII, 109.)  In her bed, Lindsey always slept

closest to the door. (Tr. VIII, 31.) Mariana and Nicole both wore T-shirts and boxers to bed from time to time. (Tr. VIII, 111.) Lindsey could hear the toilet flush in the bathroom next to her bedroom. (Tr. VIII, 111.) During sleep-overs, the girls would leave the door to Lindsey's bedroom open sometimes and closed on other occasions. (Tr. VIII, 111.) Typically, one of Lindsey's dogs, a fifteen pound terrier, would sleep with the girls in Lindsey's bed or in Lindsey's sister's room. (Tr. VIII, 111-12, 133.) Lindsey remembered that Petitioner had back problems when Lindsey was in the second grade until the sixth or seventh grade. (Tr. VIII, 133.) Petitioner could not bend over very well. (Tr. VIII, 134-35.)

Lindsey described herself as a light sleeper. (Tr. VIII, 112-13.) She would wake up if someone moved in the bed, her bedroom door opened, the covers changed, someone ran out of her room, or if the toilet flushed. (Tr. VIII, 116, 122-23.) Lindsey denied that Petitioner ever reached over her to inappropriately touch anyone in her bedroom. (Tr. VIII, 121-22.) Lindsey testified that she would have woken up. (Tr. VIII, 122.) Lindsey stated that her father never inappropriately touched her. (Tr. VIII, 124.)

In March to May of 1995, Lindsey remember her mother rearranging her bedroom furniture. (Tr. VIII, 32.) At that time, Lindsey's parents were separated because Petitioner was having an affair. (Tr. VIII, 33.) Lindsey's parents were separated from November 1994 until June 1995. (Tr. VIII, 33-34.) Petitioner moved out of the house during that period. (Tr. VIII, 94-95.) In June or July 1995, Petitioner returned and they moved to Rochester Hills in September 1995. (Tr. VIII, 42-43.)

After Lindsey redecorated her bedroom in March to May 1995, her bed was wedged into a corner. (Tr. VIII, 90-91.) Lindsey typically slept on the outside of the bed. (Tr. VIII, 92.)

On the open side of the bed, Lindsey had her night stand with a lamp, telephone and clock. (Tr. VIII, 90-91.) Prior to the redecoration, Lindsey had curtains in her room. (Tr. VIII, 89.) During the redecorating process, however, they put a sheet over Lindsey's window for privacy. (Tr. VIII, 92-93.) The sheet was up for a couple of months during the redecoration process. (Tr. VIII, 93.) Lindsey did not know of another time when there was a sheet over her bedroom window. (Tr. VIII, 96.) Lindsey testified that there was never enough room to walk on all three sides of the bed during the entire time she lived in the Sterling Heights' home. (Tr. VIII, 92-93, 123.) During the redecoration, Lindsey stated that Mariana and Nicole may have spent the night. (Tr. VIII, 103.)

Lindsey never remembered her father coming into her room at night. (Tr. VIII, 62.) Lindsey admitted, however, that Petitioner could have come into her bedroom without waking her up. (Tr. VIII, 62.) None of Lindsey's friends, including Mariana Slicker and Nicole Jacobs, ever expressed any concerns about Petitioner or any fear about coming over to Lindsey's house. (Tr. VIII, 77-79.) After sleeping over, Mariana and Nicole never appeared to be upset in the morning. (Tr. VIII, 78-79.)

Lindsey described Mariana Slicker as argumentative, moody, loud and the leader of the group. (Tr. VIII, 81-83, 126, 130-31.) Lindsey described Nicole Jacobs as quiet. (Tr. VIII, 81.) Lindsey was the moderator between Mariana and Nicole. (Tr. VIII, 81.) Lindsey testified that Mariana would lie at times. (Tr. VIII, 124-25, 130-31.) Lindsey remembered a story about Mariana's uncle but she did not believe the story. (Tr. VIII, 125-26.)

The prosecution rested. (Tr. VIII, 139.)

Michael Byrne, a licensed private investigator, testified first for the defense. (Tr. VIII, 163.) Michael previously worked as a police officer for the City of Warren for twenty-

five years.  (Tr. VIII, 164.)  As part of his investigation, Michael photographed and measured Lindsey's desk, chair, tall and short dressers, bed and night stand.  (Tr. VIII, 166-68.)  Michael also photographed several rooms in the Shaieb's Sterling Heights' home, including Lindsey Shaieb's bedroom.  (Tr. VIII, 169-72.)  Michael concluded that if Lindsey's bed was positioned in the corner of the bedroom next to the wall and the night stand was directly adjacent to the bed but pushed out from the wall, then the door to Lindsey's bedroom could close with three inches to spare.  (Tr. VIII, 176.)

The defense also called Mary Shaieb, Petitioner's wife, to testify.  (Tr. VIII, 180.) Mary testified that she has two daughters, Lindsey and Jeanette, with Petitioner.  (Tr. VIII, 181.) The Shaieb family lived in their Sterling Heights' home from January 1980 until September 1995. (Tr. VIII, 182.)  Mary noticed that Lindsey became friends with Mariana Slicker and Nicole Jacobs in the fourth grade.  (Tr. VIII, 182-83.)  Lindsey, Mariana and Nicole had strong friendships throughout elementary school and junior high until the Shaieb's moved when Lindsey was in the eighth grade.  (Tr. VIII, 183-84.)  From November 1994 until June 1995, Mary and Petitioner separated because Petitioner was having an affair.  (Tr. VIII, 190, 220.)  When Petitioner left, Mary changed the locks.  (Tr. VIII, 192.)  Mariana and Nicole slept over many times, including the period of Mary and Petitioner's separation.  (Tr. VIII, 185-86, 195.)  In March 1995, Mary, Lindsey and Jeanette began redecorating Lindsey's and Jeanette's bedrooms.  (Tr. VIII, 196-98.)  Mary corroborated the timing of the redecoration of Lindsey's room with several receipts for paint, plaster and drop clothes from  March and April 1995 that were admitted into evidence.  (Tr. VIII, 197-98, 200-02.)  Mary never redecorated Lindsey's room besides the March and April 1995 redecorating. (Tr. VIII, 198.)  In 1995, Mary removed the curtains from Lindsey's room.  (Tr. VIII, 199.)  As a

result, Mary placed a sheet over Lindsey's window. (Tr. VIII, 199.) In June 1995, Mary and Petitioner installed a window shade in Lindsey's room. (Tr. VIII, 199-200.)

Mary testified that she and Petitioner went shopping for Christmas cards and out to dinner on October 15, 1993. (Tr. VIII, 203-04.) To corroborate her statement, Mary presented an October 15, 1993 receipt from Mountain Jack's restaurant with a time stamp of 10:35 pm. (Tr. VIII, 203.) Mary was not sure if her daughters had been with them that day. (Tr. VIII, 233.) If the girls were not with them, they were probably home. (Tr. VIII, 234.) Mary stated that she never allowed her daughters to have any sleep-overs when she or Petitioner were not present, therefore, Mariana Slicker could not have slept over that night. (Tr. VIII, 205, 235.)

Mary never observed Mariana Slicker or Nicole Jacobs to be emotional when they woke up in the morning. (Tr. VIII, 210, 212.) She also never found that Mariana or Nicole avoided Petitioner. (Tr. VIII, 210, 212.) Mary noted that Lindsey was a light sleeper. (Tr. VIII, 213.) Mary stated that one of their dogs would take turns sleeping on Lindsey's or Jeanette's bed. (Tr. VIII, 215.) Mary finally testified that Petitioner had back surgery in 1989. (Tr. VIII, 216.) As a result of the surgery, Petitioner still has to be careful about lifting or bending over. (Tr. VIII, 216-17.)

On March 23, 1998, Detective Linda Deprez came to the Shaieb's home. (Tr. VIII, 217.) Mary was shocked when she learned of the allegations. (Tr. VIII, 218.) Shortly thereafter, Petitioner came home. (Tr. VIII, 218.) Petitioner was also shocked to learn of the allegations from Detective Deprez. (Tr. VIII, 219.) Petitioner stated that he did not know why the girls would say those things but maybe for the money. (Tr. VIII, 219.) Mary testified that Petitioner said "Mary, I did not do this." (Tr. VIII, 219.) Mary told Detective Deprez that she needed to consider the source, Mariana, because she was a troubled young woman. (Tr. VIII, 242.) Mary also believed

that Nicole could have fabricated the story. (Tr. VIII, 247.) On cross-examination, Mary testified that Petitioner's attorney told them not to talk to Detective Deprez. (Tr. VIII, 251.)

The defense rested. (Tr. IX, 10.)

At the conclusion of the trial, on December 8, 2000, the jury found Petitioner guilty of one count of first-degree CSC and one count of second-degree CSC as to Mariana Slicker. (Tr. XI, 2-3.) The jury also found Petitioner guilty of two counts of second-degree CSC as to Nicole Jacobs. (Tr. XI, 3.) On January 18, 2001, Petitioner was sentenced to concurrent prison terms of nine to twenty years for the first-degree criminal sexual conduct conviction and five to fifteen years for each of the second-degree criminal sexual conduct convictions. (S. Tr. 55-57, docket #37.) On August 22, 2001, Petitioner was re-sentenced to concurrent prison terms of eight to twenty years for the first-degree CSC conviction and five to fifteen years for each of the second-degree CSC convictions. (R. Tr. 19-20, docket #39; Pet'r's Br. in Supp. of Pet. at 4 n.7, docket #2.)

**B.      Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals. His brief raised the following claims of error:

I.      THE PROSECUTOR VIOLATED [PETITIONER'S] CONSTITUTIONAL RIGHTS IN HER CLOSING ARGUMENT BY ASKING THE JURORS TO INFER HIS GUILT FROM HIS FAILURE TO [] VOLUNTEER INFORMATION TO THE INVESTIGATING OFFICER;

A.      THE PROSECUTOR'S COMMENTS TO THIS JURY VIOLATED [PETITIONER'S] RIGHTS UNDER THE FIFTH AMENDMENT AND THE MICHIGAN CONSTITUTION TO NOT BE PENALIZED FOR REMAINING SILENT DURING THE COURSE OF A CRIMINAL INVESTIGATION;

II.     THE CSC 1ST CONVICTION IN THE SLICKER CASE MUST BE REVERSED TO AVOID MANIFEST INJUSTICE; THE REQUIRED FINDING THAT

SLICKER WAS UNDER 13 AT THE TIME OF THE OFFENSE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE;

III.    BECAUSE COUNSEL FAILED TO MOVE FOR [A] NEW TRIAL AS TO THE CSC 1ST OFFENSE, [PETITIONER] WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL; AND

IV.    THE NEW SENTENCES IMPOSED ON AUGUST 22, 2001[] ARE INVALID BECAUSE THE TRIAL COURT FAILED TO PREPARE A SEPARATE SENTENCING INFORMATION REPORT IN THE JACOBS CASE, FAILED TO RECOGNIZE THAT THE CORRECT GUIDELINE RANGE IN THE JACOBS CASE CALLED FOR A MINIMUM SENTENCE OF 1 TO 3 YEARS, AND FAILED TO EITHER SENTENCE [PETITIONER] WITHIN THE RANGE THAT APPLIED OR ARTICULATE REASONS FOR THE UPWARD DEPARTURE THAT RESULTED FROM THE DISPROPORTIONATE 5 YEAR MINIMUM SENTENCE ACTUALLY IMPOSED.

(*See* Attach. 2 to Pet'r's Br. in Supp. of Pet., Appellant's Br. on Appeal at i-ii, docket #2.)  By

unpublished opinion issued on September 9, 2003, the Michigan Court of Appeals rejected all

appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* Sept. 9, 2003 Mich.

Ct. App. Opinion (MCOA Op.), docket #40.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court,

raising the following claims that are similar, but not identical to the claims presented in the

Michigan Court of Appeals:

I.    THE PROSECUTOR VIOLATED [PETITIONER'S] CONSTITUTIONAL RIGHTS IN HER CLOSING ARGUMENT BY ASKING THE JURORS TO INFER HIS GUILT FROM HIS FAILURE TO EVER VOLUNTEER INFORMATION TO THE INVESTIGATING OFFICER;

    A.    THE PROSECUTOR'S USE OF [PETITIONER'S] ATTORNEY-COUNSELED AND *MIRANDA*-GUARANTEED SILENCE AS SUBSTANTIVE EVIDENCE OF GUILT VIOLATED [PETITIONER'S] RIGHTS UNDER THE 5TH AMENDMENT AND THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT;

II.    THE PROSECUTOR CANNOT SHOW BEYOND A REASONABLE DOUBT THAT THE CURATIVE INSTRUCTION MADE THESE 5TH AND 14TH

AMENDMENT ERRORS HARMLESS; EVEN REVIEWING FOR PLAIN ERROR, REVERSAL IS REQUIRED;

III. THE CSC 1ST CONVICTION IN THE [MARIANA SLICKER] CASE MUST BE REVERSED TO AVOID MANIFEST INJUSTICE; THE REQUIRED FINDING THAT [MARIANA SLICKER] WAS UNDER 13 AT THE TIME OF THE OFFENSE WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE; AND

IV. ERRORS OF TRIAL AND APPELLATE COUNSEL, IF NOT EXCUSED BY THIS COURT, DEPRIVED [PETITIONER] OF THE EFFECTIVE ASSISTANCE OF COUNSEL.

A. [PETITIONER'S] TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE AT A CRUCIAL STAGE OF THE PROCEEDINGS WHEN THEY FAILED TO MOVE FOR A NEW TRIAL ON THE CSC 1ST COUNT, AND WHEN THEY FAILED TO PRESERVE AND EFFECTIVELY RAISE THE 14TH AMENDMENT ISSUE.

(*See* Appellant's Application for Leave to Appeal at iv-v, docket #41.) By order entered June 10, 2004, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed by the court. (*See* June 10, 2004 Mich. Order, docket #41.) Justices Cavanaugh and Kelley, however, would have granted leave to appeal. (*Id.*) On November 15, 2004, the United States Supreme Court denied his petition for writ of certiorari. *See Shaieb v. Michigan,* 543 U.S. 987 (2004).

On or about November 7, 2005, Petitioner filed an application for habeas corpus relief in the above captioned case. Because the Court found Petitioner's application for habeas corpus relief was a "mixed petition," i.e. a petition asserting both exhausted and unexhausted claims, and Petitioner had fewer than sixty days remaining in the statute of limitations period, the Court ordered Petitioner to show cause why he was entitled to a stay of his habeas corpus proceedings. (*See* Dec. 8, 2005 Op. & Order, docket ##3, 4.) Upon reviewing Petitioner's response (docket #5)

to the order to show cause, this Court granted Petitioner a stay while he pursued his unexhausted claims in the state courts on March 7, 2006.  (*See* Mar. 7, 2006 Op. & Order, docket ##6, 7.)

### C.   Post-conviction Relief

Petitioner filed a motion for relief from judgment in the Macomb County Circuit Court on April 6, 2006.  (*See* Docket Sheet for Case No. 1999-000729-FC at 3, docket #17.)  The trial court denied his motion on September 5, 2006.  (*See* Sept. 5, 2006 Op. & Order at 6, docket #43.)  Petitioner then filed an application for leave to appeal in the Michigan Court of Appeals asserting the following claims of error:

I.   THE [PROSECUTOR] VIOLATED [PETITIONER'S] FOURTEENTH AMENDMENT RIGHTS BY IMPROPERLY COMMENTING ON [PETITIONER'S] PRE- AND POST-ARREST SILENCE, INCLUDING HIS DECISION [NOT TO] TESTIFY AT TRIAL;

II.   [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL BECAUSE TRIAL COUNSEL FAILED TO ARGUE THAT [MARIANA SLICKER] WAS 13 YEARS OLD AT THE TIME OF THE ALLEGED OFFENSE;

III.   [PETITIONER] WAS DENIED [THE] EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL BECAUSE COUNSEL FAILED TO SEEK A REMAND TO EXPAND THE RECORD REGARDING THE INEFFECTIVE ASSISTANCE OF COUNSEL ARGUMENTS[;]

IV.   [PETITIONER] WAS DENIED [THE] EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL BECAUSE THEY FAILED TO SUFFICIENTLY ARGUE A 14TH AMENDMENT VIOLATION WHEN THE PROSECUTOR USED [PETITIONER'S] SILENCE AFTER HIS ARREST AND RECEIVING *MIRANDA* WARNINGS AS EVIDENCE IN THE TRIAL AND AS A REASON TO FIND THE DEFENDANT GUILTY[;] AND

V.   [PETITIONER] WAS DENIED [THE] EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL BECAUSE THEY DID NOT ARGUE THAT THE [PETITIONER'S] 5TH AMENDMENT RIGHTS AGAINST SELF INCRIMINATION WERE VIOLATED WHEN THE

PROSECUTOR REFERRED TO [PETITIONER'S] SILENCE DURING
HER CLOSING ARGUMENT[.]

(*See* Appellant's Br. on Appeal at 9-10, docket #43.)  On November 28, 2006, the Michigan Court

of Appeals denied Petitioner's application for failure to meet the burden of establishing entitlement

to relief under Michigan Court Rule 6.508(D).  (*See* Nov. 28, 2006 Mich. Ct. App. Order, docket

#43.)  The court of appeals also denied Petitioner's motion to remand for a *Ginther*[2] hearing.  (*Id.*)

Petitioner raised the same five claims in his application for leave to appeal in the Michigan Supreme

Court.  (*See* Appellant's Br. on Appeal at 2, docket #44.)  By order dated March 26, 2007, the

Michigan Supreme Court denied Petitioner's application for failure to meet the burden of

establishing entitlement to relief under Michigan Court Rule 6.508(D).  (*See* Mar. 26, 2007 Mich.

Order, docket #44.)  The Michigan Supreme Court also denied Petitioner's motion to remand.  (*Id.*)

Having completed the proceedings in the state court on Petitioner's motion for relief

from judgment, Petitioner filed a motion (docket #8), memorandum (docket #9) and exhibits[3]

(docket #10) to lift the stay, to amend his habeas petition, to re-open the above-captioned case and

to request an evidentiary hearing on April 23, 2007.  The Court lifted the stay on May 4, 2007.  (*See*

May 4, 2007 Order, docket #11.)  Because Petitioner stated in his motion (docket #8) that his

original petition set forth his grounds for habeas corpus relief, this Court ordered Respondent to

answer the original petition (docket #1) as supplemented by Petitioner's motion to amend and

supporting documents (docket ##8-10).  (*Id.*)

---

[2]*See People v. Ginther,* 390 Mich. 436, 443-44 (Mich. 1973).

[3]While Petitioner provided a list of exhibits, Petitioner did not actually submit the exhibits to this Court.
Nevertheless, all of the exhibits were provided by Respondent in accordance with the requirements of Rule 5 of Rules
Governing Section 2254 Cases in the United States District Court.

On May 12, 2008, Petitioner filed a motion and supporting documents for leave to expand the record (docket ##46-48) with additional information regarding the necessity of an evidentiary hearing for Petitioner's ineffective assistance of counsel claims. This Court granted Petitioner's motion on January 26, 2009. (*See* Jan. 26, 2009 Order, docket #50.)

## II.  Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir.

1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### III.  Discussion[4]

#### A.      Right to Remain Silent

In Petitioner's first and second grounds of his application for habeas corpus relief, Petitioner argues that he was denied his right to remain silent under the Fifth and Fourteenth Amendments because the prosecutor improperly commented on Petitioner's pre-arrest silence, pre-*Miranda*; post-arrest, post-*Miranda* silence; and Petitioner's decision not to testify at trial.

During the presentation of the prosecutor's case-in-chief, Detective Linda Deprez testified regarding her meeting with Petitioner at Petitioner's house on March 23, 1998.  (Tr. VII, 233.)

> Q      Did you say anything else to him?
>
> A      I asked him if he'd come to the police station to make any type of a statement and we could continue with our investigation, the investigation tools that we have.  And again, I left my business card and – with him and he said he wanted to stay [sic], he wanted to clear things up.
>
> Q      He said he wanted to clear things up to you?

---

[4]Petitioner raised his second, fourth, sixth, seventh and eighth grounds for habeas corpus relief in his motion for relief from judgment.  Respondent argues that several of Petitioner's claims are procedurally defaulted because the Michigan Court of Appeals and Michigan Supreme Court denied leave to appeal pursuant to MICH. CT. R. 6.508(D). (*See* Nov. 28, 2006 Mich. Ct. App. Order, docket #43; Mar. 26, 2007 Mich. Order, docket #44; Answer to Pet. at 2, 9-10, 18, docket #15.)  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).  In addition, "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).  "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525.  In light of the fact that Petitioner's second, fourth, sixth, seventh and eighth grounds are without merit or noncognizable, judicial economy dictates addressing the merits of these claims.

| Q | Yes, he did. |
| | |

A        Yes, he did.

Q        And that was March 23rd of 1998?

A        Yes.

Q        Did you hear from him after that?

A        No.

Q        Did you hear from Mary Shaieb after that?

A        No.

Q        Did you hear from Lindsey Shaieb after that?

A        No.

Q        Did you have an opportunity to speak to any of those people after that initial
time that you were at the house?

A        No.

Q        Why is that?

A        They refused to come for an interview.

(Tr. VII, 233-34.)  A few days later, Petitioner's attorney contacted Detective Deprez.  (Tr. VII,

234.)  Petitioner never objected to the prosecutor's line of questioning.  Upon cross-examination,

Petitioner's counsel elicited the following testimony from Detective Deprez:

Q        All right.  Are you suggesting for the moment that the fact he didn't come
into your police department and be interviewed is noncooperative?

A        To a certain extent, because when I was at the house, he said he would and
then he changed his mind.

***

Q        As a matter of fact, the way you learned he changed his mind is because some
lawyer by the name of Steve Rabaut personally contacted you and told you
he won't [be] in for an interview, right?

<pre>
         A      Correct.
</pre>

(Tr. VII, 248.)

Mary Shaieb, Petitioner's wife, testified on cross-examination by the prosecutor that she did not contact Detective Deprez.

<pre>
         Q      Didn't Detective Deprez give you a card and have you – tell you to contact
                her?

         A      Yes, she gave me a card and said feel free to call her at any time.

         Q      Did you ever do that?

         A      I wanted to.

         Q      No.

         A      I wanted to.

         Q      No.  Is the answer –

         A      No, I didn't.

         Q      Did you ever have Lindsey do that?

         A      No.  We were advised not to do that.

         Q      Thank you ma'am.  By your attorney?

         A      Yes.
</pre>

(Tr. VIII, 251.)  The prosecutor also questioned Petitioner's daughter, Lindsey Shaieb, about her lack of cooperation with the police department:

<pre>
         Q      [T]his case has been pending for almost two and a half years, right?

         A      Correct.

         Q      Did you [] think that you should call the Sterling Heights Police Department or
                the Macomb prosecutor's office to talk to them about this case?
</pre>

A    No.

Q    Never?

A    Never.

(Tr. VIII, 69-70.)

In her closing argument, the prosecutor emphasized that Petitioner, Mary Shaieb and

Lindsey Shaieb never met with Detective Linda Deprez:

> The detective also tells you that [Petitioner] came into the house while she was there, and she indicated to him, you know, "This is why I'm here. I'd like to sit down and I'd like to meet with you." And at that time he seemed like he wanted to sit and meet with her, and she gave the card to at least one of them, if not both of them, saying this is my card with my number on it, please contact me, [] and that was back on March 23rd of 1998 and here we are today and that card has never been used, not by Lindsey Shaieb, not by Mary Shaieb, not by [Petitioner].
>
> And if [Petitioner] has an attorney and wants to communicate through his attorney, and that's what happened within days, the attorney contacted the detective and said, "I represent [Petitioner]," at that point we are on notice that police officers, prosecutors, any contact that's to be made to [Petitioner] is through his attorney.
>
> However, and, you know, argument will be made, "Well, no, I'm the attorney for [Petitioner], not for Mary Shaieb or Lindsey Shaieb." So they certainly could have come forward and said, "[w]e want to give this --" we certainly appreciate them coming here yesterday at the eleventh hour and say, "These girls have always had problems and they are easily led and that's why this has happened." That's very nice that they share that with us today. I wish they had shared that with the detective in the two and a half years that the case has been pending.
>
> And certainly if [Petitioner] had an attorney representing him, he could have certainly had that attorney with him and come into the police station and met with the detective. That never happened.

(Tr. IX, 34-35.) Petitioner's attorney immediately objected to the prosecutor's closing argument on

Fifth Amendment grounds. (Tr. XI, 36.) The trial court excused the jury and the parties debated

the objection. (Tr. XI, 36-43.) Ultimately, the trial court sustained the objection, lectured the

prosecutor outside the jury's presence on the improper colloquy and offered to instruct the jury on Petitioner's right to remain silent at the end of the trial.[5]  (Tr. IX, 36-43.)

After closing arguments, Petitioner's counsel moved for a mistrial in the absence of the jury because the prosecutor "unequivocally" violated Petitioner's Fifth Amendment right to remain silent.  (Tr. IX, 91-93.)  The trial court denied Petitioner's motion for mistrial but provided the following curative instruction to the jury during jury instructions:

> You are not to consider the fact that [Petitioner], [Petitioner's] wife or [Petitioner's] daughter failed to contact the police or prosecutor's office after Detective Deprez' initial investigation.  [Petitioner] and his family have an absolute right not to do anything with regard to the People's investigation.

(Tr. IX, 104, 119.)  Petitioner's counsel did not object to the curative jury instruction.

Approximately two weeks after the jury verdict, Petitioner raised a second motion for mistrial based on the same Fifth Amendment grounds in his first motion for mistrial.  (Mot. for Mistrial at 2-8, docket #36.)  After listening to arguments, the trial court denied Petitioner's motion by explaining:

> I disagree with you because I can differentiate the two situations.  We have one situation where they failed to respond, where a curative instruction was given that he had no responsibility to respond and even add[ed] the fact that neither did his daughter or his wife.  Had [the prosecutor] gone up during clos[ing] arguments and made a comment to the effect that he sat there, he didn't do anything, he didn't get up to testify, he didn't say anything, he didn't tell us his side of the story, that I would find to be prosecutorial misconduct.
>
> I gave a curative instruction.  I feel that that curative instruction was sufficient enough to inform the jury that [Petitioner] did not have to do anything, and that he should not be held responsible.  I am satisfied in my find[ing] that [the] curative instruction was significant enough to place in that jury's mind the fact that he didn't have to do any[thing].  Had [the prosecutor] got[ten] up there and started

[5]In its opinion, the Michigan Court of Appeals noted that although the trial court did not identify the legal basis for its decision, it found that the trial court must have concluded that the prosecutor's comments violated Petitioner's Fifth Amendment rights.  (MCOA Op. at 2 n.2, docket #40.)

badgering him about not testifying, that would be different and that's where I'm drawing the line. So your motion is denied.

(Mot. for Mistrial at 18-19, docket #36.)

### 1. Pre-Arrest, Pre-*Miranda*[6] Silence

Petitioner argues that during the prosecutor's closing argument, the prosecutor violated his rights under the Fifth and Fourteenth Amendments by improperly commenting on Petitioner's failure to volunteer information to the police prior to his arrest and prior to his *Miranda* warnings. Petitioner never contacted Detective Deprez to discuss the allegations by Mariana Slicker and Nicole Jacobs after Detective Deprez left her card at Petitioner's residence on March 23, 1998. Petitioner alleges that the prosecution violated his rights by using his pre-arrest, pre-*Miranda* silence as substantive evidence of guilt. The Fifth Amendment guarantees "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Griffin v. California,* 380 U.S. 609, 615 (1965). In general, a defendant's decision to remain silent cannot be used as substantive evidence of guilt. *Id.*

The Michigan Court of Appeals rejected Petitioner's claim as follows:

In part, we determine whether the prosecutor's use of [Petitioner's] silence violates the constitution by examining when the referenced silence occurred. *See People v. Hackett*, 460 Mich 202, 209-210; 596 NW2d 107 (1999). In the instant case, the prosecutor referenced [Petitioner's] silence extending from the time Detective Deprez left his home until the time of trial.[2] Because [Petitioner's] silence prior to his arrest is not constitutionally protected, *People v. Schollaert*, 194 Mich App 158, 167; 486 NW2d 312 (1992), to the extent the prosecutor referred to the time period before [Petitioner's] arrest, the prosecutor's comment did not violate [Petitioner's] Fifth Amendment rights.[3] Rather than raising constitutional issues, the use of pre-arrest silence presents evidentiary issues. *Id.*; *Hackett, supra* at

---

[6]*Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

213-214. [Petitioner], however, did not raise an evidentiary objection in the trial court and does not assert one in his statement of questions presented. Thus, we do not need to consider the evidentiary issue. *Busch v. Holmes*, 256 Mich App 4, 12; 662 NW2d 64 (2003).

---

[2]Because the prosecutor referred to [Petitioner's] failure to "come into the police station and [meet] with the detective," it is evident that the prosecutor's reference to the "two and a half years that the case has been pending" did not include [Petitioner's] decision to stand mute at trial. Use of [Petitioner's] silence at trial would have violated [Petitioner's] Fifth Amendment right against self-incrimination. *People v. Fields*, 450 Mich 94, 108-109; 538 NW2d 356 (1995), citing *Griffin v. California*, 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965).

[3][Petitioner] relies on *Combs v. Coyle*, 205 F3d 269 (CA 6, 2000), and cases from other federal and state courts for the proposition that a defendant's pre-arrest silence cannot be used as substantive evidence of guilt. The Court in *Schollaert, supra*, reached the opposite conclusion, relying heavily on Justice Stevens' concurrence in *Jenkins v. Anderson*, 447 US 231, 243-244; 100 S Ct 2124; 65 L Ed 2d 86 (1980). As Justice Stevens stated, "When a citizen is under no official compulsion whatever, either to speak or remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether [a defendant] was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent. A different view ignores the clear words of the Fifth Amendment." [*Schollaert, supra* at 316, quoting *Jenkins, supra*.]

(MCOA Op. at 4, docket #40.)

A federal court may grant a habeas corpus petition only when it concludes that the state adjudication of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," 28 U.S.C. § 2254(d)(2). A habeas court may only look at the holdings of the United States Supreme Court as they existed at the time of the relevant state court decision to determine whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law. *Mitzel v. Tate*, 267 F.3d 524, 530-31 (6th Cir. 2001). A habeas court cannot look to the decisions of this circuit, or other courts of appeals, when deciding whether a state court's

decision was contrary to, or an unreasonable application of, clearly established federal law. *Id.* In the present case, the United States Supreme Court has not spoken dispositively on the issue of whether the use of a criminal defendant's pre-arrest silence as substantive evidence violates the Fifth or Fourteenth Amendments. *See Hall v. Vasbinder*, __F.3d__, No. 08-1475, 2009 WL 1066082, at *7 (6th Cir. Apr. 22, 2009) (citing *Jones v. Trombley,* No. 07-1419, 2009 WL 152312, at *2 (6th Cir. Jan. 22, 2009)).

The Sixth Circuit has held that the use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination. *Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000) (finding that the prosecutor violated the defendant's right to remain silent by eliciting testimony that the defendant, who did not testify at trial, told police "to talk to my lawyer" and the prosecutor argued during closing arguments that the defendant knew the gravity of the situation); *but see Hall*, 2009 WL 1066082, at *7 (finding *Combs* is not controlling because the Sixth Court reviewed it under a pre-AEDPA, *de novo* standard of review) and *Jones,* 2009 WL 152312, at *3 n.1 (same). In *Combs,* the Sixth Circuit acknowledged, however, that the Supreme Court in *Jenkins v. Anderson*, 447 U.S. 231, 238-39 (1980) never addressed the issue of whether the use of pre-arrest silence as substantive evidence of guilt violated the Fifth or Fourteenth Amendments. *Id.* at 281; *see also Hall*, 2009 WL 1066082, at *7 (citing *Jones,* 2009 WL 152312, at *2).

In *Jenkins*, 447 U.S. at 238-39, the United States Supreme Court held that the Fifth Amendment, as applied to the states through the Fourteenth Amendment, is not violated by the use of a defendant's pre-arrest, pre-*Miranda* silence for *impeachment* purposes, since the "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding

function of the criminal trial." *Id.* The petitioner in *Jenkins* remained silent before his arrest but chose to testify at his trial. *Id.* at 236, n.2. Notably, the *Jenkins* Court specifically declined to address whether pre-arrest silence may implicate Fifth Amendment concerns under other circumstances. *Id.*; *see also Portuondo v. Agard*, 529 U.S. 61, 69-70 (2000) (reiterating *Jenkins*' limited holding). The closest the Supreme Court has come to answering the question was Justice Stevens' concurring opinion in *Jenkins*, 447 U.S. at 241-44, in which Justice Stevens indicated that the prohibition on the use of a defendant's silence as substantive evidence does not apply to pre-custody silence. The federal circuits are "equally divided" over whether a defendant's pre-arrest silence could be used as substantive evidence of guilt. *See Combs*, 205 F.3d at 282 (collecting cases); *Jones*, 2009 WL 152312, at *3.

Notwithstanding the Sixth Circuit's holding in *Combs*, *supra* at 283, that pre-arrest silence may merit Fifth Amendment protection, Section 2254(d)'s deferential standard does not allow for habeas relief in the absence of Supreme Court precedent. The lack of Supreme Court precedent on the use of a defendant's pre-arrest silence as substantive evidence of guilt, precludes this Court from finding that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law. *See Hall*, 2009 WL 1066082, at *8 (citing *Combs*, 205 F.3d at 282-83. Thus, the introduction of Petitioner's pre-arrest, pre-*Miranda* silence in the prosecutor's closing argument was not "contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1). *See Mitchell v. Lafler*, 118 F. App'x 24, 26-27 (6th Cir. 2004); *see also Cameron v. Birkett*, 348 F. Supp. 2d 825, 841-42 (E.D. Mich. 2004). Petitioner is therefore not entitled to habeas corpus relief on this ground.

**2.      Post-Arrest, Post-*Miranda* Silence**

Petitioner argues that the prosecutor violated his rights under the Fifth and Fourteenth Amendments by commenting on his silence from the time of his arrest until the beginning of the trial. The Michigan Court of Appeals assumed that Petitioner received his *Miranda* warnings at the time of his arrest. (MCOA Op. at 5 n.6, docket #40.) In his habeas brief, Petitioner confirmed that the Michigan Court of Appeals' assumption was correct. (Pet'r's Br. in Supp. of Pet. at 26; docket #2.)

The Michigan Court of Appeals rejected Petitioner's claims as follows:

> We also find that the reference to [Petitioner's] silence from the time of his arrest until trial did not violate [Petitioner's] Fifth Amendment right against self-incrimination.[4] Contrary to [Petitioner's] argument, *People v. Bobo*, 390 Mich 355, 359; 212 NW2d 190 (1973), does not require a different result. Our Supreme Court has severely limited *Bobo*, stating that *Bobo* is "viable only to the extent that it precluded 'impeachment for and comment on silence at the time of arrest in the face of accusation.'" *Hackett*, *supra* at 215 n 6, quoting *People v. Collier*, 426 Mich 23, 39; 393 NW2d 346 (1986); *People v. Cetlinski*, 435 Mich 742, 759; 460 NW2d 534 (1990) ( "[I]n light of both pre- and post-*Bobo* decisions of the United States Supreme Court, it is clear that the Fifth Amendment rationale no longer supports the *Bobo* rationale."). Additionally, the Court has said that *Bobo* is coextensive with federal precedent, and the Michigan constitution is consistent with federal Fifth Amendment and Fourteenth Amendment jurisprudence. *Schollaert*, *supra* at 162, citing *People v. Sutton* (After Remand), 436 Mich 575, 579; 464 NW2d 276 (1990); *People v. McReavy*, 436 Mich 197, 201; 462 NW2d 1 (1990); and *Cetlinski, supra* at 759.
>
> Although [Petitioner's] right to remain silent in the face of accusation arises under the Fifth Amendment, the prohibition on use of [Petitioner's] silence after arrest and receiving *Miranda*[5] warnings[6] arises out of the due process clause of the Fourteenth Amendment.[7] *See McReavy*, *supra* at 218 & n 21, citing *Doyle v. Ohio*, 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976) (stating that "it would be fundamentally unfair and a violation of due process" to inform a defendant that he has a right to remain silent and then use his silence against him at trial); and *Wainwright v. Greenfield*, 474 US 294; 106 S Ct 634; 88 L Ed 2d 623 (1986) (stating that use of post-arrest, post- *Miranda* silence as substantive evidence of sanity violates due process). [Petitioner] briefly mentions that the prosecutor's argument also violated *Doyle*, but does not request relief on this basis. Additionally, [Petitioner] did not raise an objection on due process grounds in the trial court. An objection on one ground does not preserve an appeal on another ground. *City of*

*Westland v. Okopski*, 208 Mich App 66, 72-73; 527 NW2d 780 (1994). [Petitioner] has not cited any viable authority that supports his contention that use of his post-arrest silence also violates the Fifth Amendment. A party may not leave it to this Court to search for authority to support its position. *People v. Harlan* (On Remand), ____ Mich App ____; ____ NW2d ____ (Docket No. 237281, issued 8/14/03) slip op at 1-2, citing *People v. Watson*, 245 Mich App 572, 587; 629 NW2d 411 (2001).

In any event, we would find that the trial court did not abuse its discretion by denying [Petitioner's] motion for a mistrial. The trial court properly concluded that its instruction to the jury cured any error by the prosecution. Unless there is an "'overwhelming probability' that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant ...," we presume that the jury complied with the trial court's curative instruction. *Dennis*, *supra* at 581, quoting *Greer v. Miller*, 483 U.S. 756, 767 n 8; 107 S Ct 3102; 97 L Ed 2d 618 (1987) (citations omitted). Because [Petitioner's] post-arrest silence was "at most 'insolubly ambiguous,"' *Greer*, *supra* at 767 n 8, quoting *Doyle*, *supra* at 617, the effect of [Petitioner's] post-arrest silence was not devastating. Accordingly, the trial court reasonably concluded that its instruction cured any error and that declaring a mistrial was not necessary. *Dennis*, *supra* at 582.

_____

[4]The record does not indicate when [Petitioner] was arrested or for what length of time he was in custody. We refer to the time of his arrest, however, in light of its importance to our analysis. *Hackett*, *supra*.

[5]*Miranda v. Arizona*, 384 US 436; 86 S Ct 1602; L Ed 2d 694 (1966).

[6]Despite that the record does not address whether or when [Petitioner] received *Miranda* warnings, in the absence of any assertion from [Petitioner] to the contrary, we assume for purposes of this analysis that [Petitioner] properly received *Miranda* warnings upon his arrest.

[7]Although the issue whether use of post-arrest post-*Miranda* silence also violates the Fifth Amendment right against self-incrimination was presented to the United States Supreme Court in *Doyle*, the Court did not address the issue. *Doyle*, *supra* at 616, 626 (Stevens, J., dissenting). The Court in *Wainright*, in its analysis of substantive use of post-arrest silence, specifically noted that *Doyle* did not rest on a Fifth Amendment analysis, unlike *Griffin*. *Wainright*, *supra* at 291 n 7. See also *Dennis*, *supra* at 573.

(MCOA Op. at 4-6, docket #40.)

Petitioner frames his claim as prosecutorial misconduct in his habeas corpus brief.

(Pet.'r's Br. in Supp. of Pet. at 21-22, docket #2.) Misconduct by a prosecutor can rise to the level

of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). "The touchstone of due-process analysis is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Consequently, the giving of cautionary instructions is relevant to determining whether fundamental fairness was denied. *Id.* at 1356.

Petitioner's prosecutorial misconduct claim implicates the Supreme Court's holding in *Doyle v. Ohio*, 426 U.S. 610 (1976). In *Doyle*, 426 U.S. at 619, the Supreme Court held that the use of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, to impeach his exculpatory story given at trial violates the Due Process Clause of the Fourteenth Amendment. *See also Greer v. Miller*, 483 U.S. 756, 763 (1987). The Supreme Court's holding in *Doyle* was not based on a defendant's Fifth Amendment right against self-incrimination, but on the Due Process Clause and its guarantee against fundamental unfairness. *Doyle*, 426 U.S. at 618-19. The defendants in *Doyle* were arrested for selling marijuana. *Id.* at 611. They were given *Miranda*

warnings and made no post-arrest statement about their involvement in the crime. *Id.* at 612-14. At trial, the defendants took the witness stand and offered an exculpatory explanation for their participation in an alleged drug transaction. *Id.* On cross-examination, the prosecutor impeached their testimony by repeatedly asking them, if they were indeed innocent, why they had not explained their conduct at the time of their arrest. *Id.* at 613-14. The Court held that *Miranda* warnings carry an implicit assurance "that silence will carry no penalty," and, thus, it would be fundamentally unfair and a violation of due process to use the defendants' post-arrest, post-*Miranda* silence for impeachment purposes. *Id.* at 618-19. Ten years later in *Wainwright v. Greenfield*, 474 U.S. 284, 290 (1986), the Supreme Court found that the prosecutor's use of the defendant's post-arrest, post-*Miranda* silence as evidence of sanity violated the Due Process Clause. *Id.* at 295.

A year after *Wainwright* was decided, the Supreme Court did not find a due process violation under circumstances where the prosecutor made a brief reference to the defendant's post-arrest, post-*Miranda* silence. *See Greer*, 483 U.S. at 758-60, 763, 766. In *Greer*, 483 U.S. at 758, the defendant and two other men were charged with kidnapping, robbery and murder. The defendant testified on direct examination that he had taken no part in the crime, but that the other men had come to him after the murder was committed seeking his advice. *Id.* At the beginning of the defendant's cross-examination, the prosecutor asked him: "[w]hy didn't you tell this story to anybody when you got arrested?" *Id.* at 759. Defense counsel immediately objected and, out of the jury's hearing, requested a mistrial on the ground that the prosecutor's question violated the defendant's right to remain silent after arrest. The judge denied the motion, but immediately sustained the objection and instructed the jury to "ignore [the] question, for the time being." *Id.* The prosecutor did not pursue the issue further and did not mention it during his closing argument. *Id.*

The judge's final instructions to the jury included a second caution to "disregard questions . . . to which objections were sustained." *Id.* The Court held that no *Doyle* violation occurred because the prosecutor was stopped before he called attention to the defendant's silence or used his silence for impeachment purposes. *Id.* at 764-65.

Notwithstanding the lack of *Doyle* error, the Supreme Court went on to consider whether the prosecutor attempted to violate the rule of *Doyle* by asking an improper question in the presence of the jury. *Greer*, 483 U.S. at 765. The Court concluded that the prosecutor's conduct did not deny the defendant a fair trial, stating: "[t]he sequence of events in this case -- a single question, an immediate objection, and two curative instructions -- clearly indicates that the prosecutor's improper question did not violate Miller's due process rights." *Id.* at 766 (footnote omitted). The first curative instruction occurred immediately after the trial court sustained defense counsel's objection to the prosecutor's question. The second curative instruction occurred before the jury began to deliberate. *Id.* at 766 n.8.

In this case, the prosecutor's reference to Petitioner's post-arrest, post-*Miranda* invocation of his right to remain silent did not violate the Supreme Court's holding in *Doyle*. Unlike *Doyle,* Petitioner did not testify, and, thus, did not provide an exculpatory story for the first time at trial. The prosecutor's remarks during closing arguments were therefore not an attempt to impeach trial testimony to which *Doyle* applies. *See Babick v. Berghuis,* No. 1:03-cv-20, 2008 WL 282166, at *21 (W.D. Mich. Jan. 29, 2008) (the prosecutor's remarks during closing arguments were not an attempt to impeach trial testimony because the petitioner did not testify, and, thus, did not provide an exculpatory store for the first time at trial). Moreover, the trial court followed the due process safeguards approved by the Supreme Court in *Greer*. *See Greer,* 483 U.S. at 766. Upon the

prosecutor's closing argument regarding Petitioner's, Mary Shaieb and Lindsey Shaieb's failure to meet with Detective Linda Deprez, Petitioner immediately objected on Fifth Amendment grounds. (Tr. IX, 36.)  Outside the presence of the jury, the trial court listened to arguments and sustained Petitioner's objection.  (Tr. IX, 36-43; MCOA Op. at 2 n.2, docket #40.)  No further argument with respect to Petitioner's silence occurred during the prosecutor's closing argument.  (Tr. IX, 43-51, 76-90.)  After closing arguments, the trial court adjourned for a few hours.  (Tr. IX, 90.)  When the trial court reconvened, the trial court specifically advised the jury in a curative jury instruction to disregard any reference by the prosecutor to the decision of Petitioner, Mary Shaieb and Lindsey Shaieb to not to contact Detective Linda Deprez after her initial investigation.  (Tr IX, 119.)  Since Mary and Lindsey Shaieb do not have a Fifth Amendment right to remain silent in this proceeding, the trial court's curative instruction went beyond what was necessary to cure the prosecutor's statements.

      Further, the trial court admonished the jury after it was sworn and during preliminary instructions as follows:

> After the prosecutor has presented all of her evidence, [Petitioner's] attorney may also offer evidence, but does not have to.  By law, [Petitioner] does not have to prove his innocence or produce any evidence.  If the defense does call any witness, the prosecutor has the right to cross-examine them.  The prosecutor may also call witnesses as to contradict the testimony of the defense witnesses.

> After all the evidence has been presented, the prosecutor and [Petitioner's] attorney will make their closing arguments.  Like the opening statements, these are not evidence.  They are only [] meant to help you understand the evidence and the way each side sees the case.  You must base your verdict only on the evidence.

(Tr. I, 194-95.)  The trial court advised the jurors of the following during jury instructions:

> It is my duty to instruct you on the law.  You must take the law as I give it to you.  If a lawyer says something different about the law, follow what I say.  At various times I have already given you some instructions about the law.  You must

take all my instructions together as the law you are to follow. You should not pay attention to some instructions and ignore others. To sum up, it is your job to decide what the facts of the case are, to apply the law as I give it to you, and in that way to decide the case.

(Tr. IX, 108-09.)

Even if a *Doyle* violation occurred, the error was harmless. The Supreme Court distinguishes between two types of constitutional errors: structural error and trial error. *See Arizona v. Fulminate,* 499 U.S. 279, 306-10 (1991). "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is *per se* prejudicial," whereas "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." *Yohn v. Love,* 76 F.3d 508, 522 (3d Cir. 1996) (citations omitted). The Supreme Court explained that "*Doyle* error fits squarely into the category of constitutional violations which we have characterized as trial error." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 637-38 (1993). The *Brecht* rule applies even when the "federal habeas court is the first to review for harmless error." *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir. 1999). Under *Brecht,* a *Doyle* error only warrants reversal if the mistake "had substantial or injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637. A "reasonable possibility" that the error influenced the outcome is not enough to warrant relief. *Id.* Rather, the defendant must show a "reasonable probability" that the error affected the verdict. *Kyles v. Whitley,* 514 U.S. 419, 435 (1995); *see also Billingslea v. Jackson,* 83 F. App'x 33, 41 (6th Cir. 2003).

The trial court issued a jury instruction, which cured any potential prejudice that could have arisen from the prosecutor's reference to Petitioner's right to remain silent during her closing argument. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that

- 46 -

the jury will be unable to follow the court's instructions, . . ., and a strong likelihood that the effect of the evidence would be devastating to the defendant, . . . ." *Greer,* 483 U.S. at 767 n.8 (citations omitted) (internal quotation marks omitted.)   There is no reason to believe that the jury was unable to obey the trial court's curative instruction.   Further, the reference to Petitioner's silence was far from "devastating."   *Id.*   During the trial, both Detective Deprez and Mrs. Shaieb testified that Petitioner denied all of the allegations when Detective Deprez confronted him on March 23, 1998. (Tr. VII, 231-32, 247; Tr. VIII, 219.)   On cross-examination, Detective Deprez stated there were several reasons why it may not be desirable for a defendant to cooperate with a police investigation. (Tr. VII, 248-52.)

Moreover, the evidence against Petitioner was strong, and the reference at issue did nothing to undermine the strength of that evidence.   Both victims testified that Petitioner inappropriately touched them during sleep-overs with Petitioner's daughter between October 1993 and November 1994 at Petitioner's house.   Mariana Slicker's birthday is February 6, 1982; and, thus, she was eleven or twelve years old between October 1993 and February 1994.   (Tr. II, 23.)   Mariana stated that Petitioner touched her buttocks in the early morning hours of October 15, 1993.   (Tr. II, 27-28, 31, 37-38.)   Mariana also testified that Petitioner rubbed her breasts and digitally penetrated her vagina in February 1994.   (Tr. II, 45-46, 54-56.)   Nicole Jacobs' birthday is May 23, 1982; and, thus, she was eleven years old between October 1993 and February 1994.   (Tr. V, 84.)   Nicole Jacobs testified that Petitioner rubbed her buttocks over her clothes during two sleep-overs between October 1993 and February 1994 when she was eleven years old.   (Tr. V, 88-89, 101; Tr. VI, 7-8, 12-13, 15-16, 19, 27.)   In light of the evidence against Petitioner, there is no reasonable probability that the reference to Petitioner's post-*Miranda* silence influenced the jury's decision.   The

prosecutor's misconduct therefore did not result in prejudice to Petitioner or deprive him of due process. Accordingly, Petitioner is not entitled to habeas relief on his post-arrest, post-*Miranda* claim.

### 3. Trial

Petitioner claims that the prosecutor's closing argument was an unconstitutional attack on his Fifth Amendment right to remain silent at trial. The Fifth Amendment provides, in relevant part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. *Griffin,* 380 U.S. at 615. The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Id.*; *see also Jenkins*, 447 U.S. at 235.

Neither the trial court nor the Michigan Court of Appeals found that the prosecutor referred to Petitioner's right to remain silent *at trial* in her closing arguments. The Michigan Court of Appeals rejected Petitioner's claim as follows:

> Because the prosecutor referred to [Petitioner's] failure to "come into the police station and [meet] with the detective," it is evident that the prosecutor's reference to the "two and a half years that the case has been pending" did not include [Petitioner's] decision to stand mute *at trial*. Use of [Petitioner's] silence at trial would have violated [Petitioner's] Fifth Amendment right against self-incrimination. *People v. Fields*, 450 Mich 94, 108-109; 538 NW2d 356 (1995), citing *Griffin v. California*, 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965).

(MCOA Op. at 4 n.2, docket #40) (emphasis in original.)

Whether the prosecutor's reference to Petitioner's silence during the "two and a half years that the case has been pending" includes Petitioner's trial is a question of fact. To succeed on his habeas claim, therefore, Petitioner must demonstrate that the state courts' denial of the claim was

- 48 -

"based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d)(2). A state court decision based on a factual determination will not be overturned unless it was objectively unreasonable in light of the evidence presented in the state court proceeding. *Dennis v. Mitchell,* 354 F.3d 511, 518 (6th Cir. 2003). "The question for this Court is simply whether the state court's decision was 'fairly supported by the record,' not whether it was right or wrong in its determination of impartiality." *Id. (quoting Wainwright v. Witt,* 469 U.S. 412, 424 (1985)). The trial court's factual determination is entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence under 28 U.S.C. § 2254(e)(1). *Lancaster,* 324 F.3d at 429; *Bailey,* 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner*, 449 U.S. at 546; *Jago*, 888 F.2d at 407 n.4. As the Sixth Circuit has explained,

> Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007) (citations omitted, internal quotation marks omitted), *cert. denied*, __U.S.__, 128 S. Ct. 1125 (2008). If the state court's factual finding was supported by evidence, federal courts sitting in habeas must defer to it. *See Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007) (on collateral review, "'[t]he [federal] appeals court gives complete deference to the . . . state court's findings of fact supported by the evidence.'") (quoting *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004)), *cert. denied*, __U.S.__, 128 S. Ct. 919 (2008)); *see also James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006) (same) (citation omitted).

The appellate court's finding was an entirely reasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." 28 U.S.C. § 2254(d)(2). In her closing argument, the prosecutor referred to Petitioner's silence for the two and one-half years that the case had been pending. (Tr. IX, 35.) Because the trial court found that the prosecutor was referring to the police investigation before Petitioner's trial, the trial court stated: "[Petitioner] and his family have an absolute right not to do anything with regard to the People's investigation" in its curative jury instruction. (Tr. IX, 104-07.) Further, the trial court denied Petitioner's second motion for mistrial on Fifth Amendment grounds by specifically stating that the prosecutor did not badger Petitioner about not testifying. (Mot. for Mistrial at 18-19, docket #36.)

> Had [the prosecutor] gone up during clos[ing] arguments and made a comment to the effect that he sat there, he didn't do anything, he didn't get up to testify, he didn't say anything, he didn't tell us his side of the story, that I would find to be prosecutorial misconduct.
>
> I gave a curative instruction. I feel that that curative instruction was sufficient enough to inform the jury that [Petitioner] did not have to do anything, and that he should not be held responsible. I am satisfied in my find[ing] that [the] curative instruction was significant enough to place in that jury's mind the fact that he didn't have to do any[thing]. Had [the prosecutor] got[ten] up there and started badgering him about not testifying, that would be different and that's where I'm drawing the line. So your motion is denied.

(Mot. for Mistrial at 18-19, docket #36.) Moreover, Petitioner has entirely failed to present any clear and convincing evidence to rebut the presumption of correctness. Petitioner merely focuses on the word "pending" in the prosecutor's closing arguments. Petitioner argues that the case was still "pending" during his trial because the verdict had not been reached. (Pet'r's Br. in Supp. of Pet. at 33, docket #2.) A court may not consider words in a vacuum. It is critical that a court examine the prosecutor's remarks in their context. *Hall*, 2009 WL 1066082, at *9 (citing *United States v. Robinson,* 485 U.S. 25, 33 (1998)). Considering the prosecutor's closing argument, the trial court's

curative instruction and the trial court's rulings on Petitioner's second motion for mistrial, the appellate court's determination of the facts was entirely reasonable. Accordingly, Petitioner's habeas claim fails.

## B. Insufficient Evidence

In his third ground for habeas relief, Petitioner asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his convictions. On direct appeal, however, Petitioner argued that the verdict was against the great weight of the evidence.[7]

To the extent that Petitioner continues to assert that the verdict was against the great weight of the evidence, he is not entitled to relief from this Court. A claim that the verdict is against the great weight of the evidence is a state law issue, which is not cognizable on habeas review. *See Cameron*, 348 F. Supp. 2d at 838 (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). The Michigan Court of Appeals rejected Petitioner's state-law great weight of the evidence claim as follows:

> Next, [Petitioner] argues that his first-degree CSC conviction is contrary to the great weight of the evidence because the complainant was at least thirteen years old at the time of the offense. [Petitioner] argues that the complainant's description of the bedroom where the offense occurred is inconsistent with the arrangement of that room before the complainant turned thirteen. Testimony in [Petitioner's] case-in-chief showed that the room was renovated in 1995, and receipts for painting supplies and room accessories were admitted to support [Petitioner's] contention that the room had been renovated in 1995. By that time, [Petitioner] argues, [Mariana Slicker] would have been at least thirteen years old.
>
> Because [Petitioner] failed to preserve this issue by raising it in a motion for a new trial, *People v. Winters,* 225 Mich App 718, 729; 571 NW2d 764 (1997), our

---

[7]On direct appeal, Petitioner asserted that his first-degree CSC conviction as to Mariana Slicker was against the great weight of the evidence because Mariana was at least thirteen years of age at the time of the offense. (*See* Attach. 2 to Pet'r's Br. in Supp. of Pet., Appellant's Br. on Appeal at ii, docket #2.) In his habeas petition, however, Petitioner challenges the sufficiency of the evidence to support his convictions. (Pet'r's Br. in Supp. of Pet. at 34, docket #2.) Because Petitioner did not present his claim in the appellate courts, it is procedurally defaulted. Nevertheless, as stated in footnote 4, *supra*, I will review Petitioner's claim on the merits.

review is limited to plain error affecting [Petitioner's] substantial rights, *Carines, supra* at 763-764. A verdict is against the great weight of the evidence if "the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v. McCray,* 245 Mich App 631, 637; 630 NW2d 633 (2001). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *People v. Lemmon,* 456 Mich 625, 647; 576 NW2d 129 (1998).

We find no plain error. Although the complainant's credibility was challenged by the defense, the jury was in a better position to judge credibility of the witnesses. We cannot say that the complainant's testimony was deprived of all probative value or that the jury could not have believed it. *Id.* at 642.

(MCOA Op. at 6, docket #40.) Although the state court of appeals applied Michigan law to its analysis, the standard of review under state law tracks the federal standard of sufficiency of the evidence.[8] As a consequence, the state-court's decision is entitled to deference unless that decision was contrary to or an unreasonable application of clearly established United States Supreme Court precedent. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412; *Bailey*, 271 F.3d at 655.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence

---

[8]In Michigan, a trial court may order a new trial "where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v. Lemmon,* 456 Mich. 625, 642 (Mich. 1998). This authority is conferred by statute and court rule. *Id.* at 634 (citing MICH. COMP. LAWS § 770.1 and MICH. CT. R. 6.431(B)).

supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

In his habeas brief, Petitioner argues that Mariana Slicker was at least thirteen years old at the time of the first-degree CSC crime. (Pet'r's Br. in Supp. of Pet. at 45-46, docket #2.) Petitioner was convicted of one count of first-degree CSC involving a victim younger than thirteen years of age, MICH. COMP. LAWS § 750.520b(1)(a), with respect to Mariana Slicker.[9] The elements of a first-degree CSC offense are: (1) that the defendant engaged in sexual penetration with another person; and (2) the other person was under thirteen years of age. MICH. COMP. LAWS § 750.520b(1)(a); *People v. Hammons*, 534 N.W.2d 183, 184 (Mich. Ct. App. 1995). Sexual penetration is statutorily defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body . . . ." MICH. COMP. LAWS § 750.520a(r).

The trial court record supports the decision of the Michigan Court of Appeals. Mariana Slicker was born on February 6, 1982; and, thus, she turned thirteen on February 6, 1995. (Tr. II, 23.) Mariana testified regarding two incidents of sexual abuse by Petitioner that occurred while she was sleeping over at Lindsey's house. The first incident occurred in the early morning hours of October 15, 1993 when Mariana was eleven years old. (Tr. II, 27-28, 32, 37-38.) The second incident occurred in the spring of 1994 when Mariana was twelve years old. (Tr. II, 45-46.) Petitioner's sufficiency of the evidence claim involves the second incident.

---

[9]Petitioner is not challenging the age of Mariana Slicker with respect to the second-degree CSC conviction. (*See* Pet'r's Br. in Supp. of Pet. at 46, docket #2.)

In the spring of 1994, Mariana testified that she slept over at Lindsey's house. (Tr. II, 45-46.) Mariana and Lindsey went to bed between 11:00 pm and 12:00 am. (Tr. II, 47.) They slept in Lindsey's bedroom. (Tr. II, 47.) Lindsey's bed was against a wall. (Tr. II, 47-49.) Mariana slept next to the wall in a T-shirt, boxers and underwear. (Tr. II, 49, 53.) Mariana remembered that the Shaieb's were redecorating Lindsey's bedroom at that time. (Tr. II, 50.) Because they were painting around Lindsey's bedroom window, Lindsey had a sheet over the window. (Tr. II, 50.) The door to Lindsey's room was slightly open that night. (Tr. II, 52.)

Mariana eventually fell asleep but woke up when Petitioner opened Lindsey's door so that the hallway light shone into the room. (Tr. II, 52.) Mariana was laying on her back and pretending to be asleep. (Tr. II, 53.) Mariana was covered with a sheet. (Tr. II, 52.) Petitioner reached over Lindsey and pulled the sheet off of Mariana's chest. (Tr. II, 52-54.) Petitioner then touched Mariana's chest under her T-shirt. (Tr. II, 54.) Specifically, Petitioner placed his hand on Mariana's breasts and began rubbing them. (Tr. II, 54-55.) Next, Petitioner moved his hand down Mariana's underwear and boxers. (Tr. II, 55-56.) Mariana testified that "[Petitioner] put his finger in [her] vagina." (Tr. II, 56.) Petitioner inserted his finger completely into Mariana's vagina. (Tr. II, 56.) Petitioner did not have his finger in Mariana's vagina for very long because Mariana turned to face Lindsey. (Tr. II, 57.) Petitioner then ran out of Lindsey's room. (Tr. II, 57.)

Petitioner does not dispute the element of penetration for the statute nor could he. Mariana's testimony that Petitioner inserted his finger into her vagina is considered penetration under the CSC statute. *See* MICH. COMP. LAWS § 750.520a(r). Mariana testified that she was twelve years old at the time of the second incident. (Tr. II, 45-46.) Petitioner, however, argues that Mariana was thirteen years old at the time of the incident because she referenced the redecoration

of Lindsey's bedroom during her testimony. Petitioner argues that the remodeling project for Lindsey's bedroom occurred between March and May in 1995. (Pet'r's Br. in Supp. of Pet. at 46, docket #2.) In March 1995, Mariana would have been thirteen years old. Lindsey Shaieb testified that she remembered her mother rearranging her bedroom between March and May 1995. (Tr. VIII, 32.) Mary Shaieb also testified that she redecorated Lindsey's room in March and April 1995. (Tr. VIII, 196-98.) As part of the redecoration, Mary removed the curtains from Lindsey's room and placed a sheet over Lindsey's window. (Tr. VIII, 199.) Mary also produced several 1995 receipts to corroborate the redecoration expenses. (Tr. VIII, 197-202.)

As stated above, questions of witness credibility are for the jury. *See Herrera*, 506 U.S. at 401-02. The jury obviously found Mariana Slicker's testimony to be more credible than Mary and Lindsey Shaieb's testimony. The testimony of Mariana Slicker was sufficient to prove each element of first-degree CSC. In light of the evidence presented at trial, the decision of the state court clearly was a reasonable application of *Jackson*. Petitioner, therefore, is not entitled to habeas corpus relief on his sufficiency of the evidence claim.

### C.    Ineffective Assistance of Trial and Appellate Counsels

In his fourth, fifth, sixth, seventh and eighth grounds for habeas corpus relief, Petitioner raises ineffective assistance of counsel claims. Petitioner argues that: (i) his trial counsel was ineffective when he failed to argue that Mariana Slicker was thirteen years old at the time of the alleged crime; (ii) his trial and appellate counsel were ineffective when they failed to move for a new trial when the great weight of the evidence showed that Mariana Slicker was thirteen years old at the time of the alleged crime; (iii) his appellate counsel was ineffective when counsel failed to seek a motion for remand to expand the trial record regarding the ineffective assistance of counsel

arguments; (iv) his trial and appellate counsel were ineffective because they failed to sufficiently argue a Fourteenth Amendment violation when the prosecutor used Petitioner's silence, after his arrest and receiving *Miranda* warnings, as evidence in the trial; and (v) his trial and appellate counsel were ineffective because they did not argue that Petitioner's Fifth Amendment right against self incrimination was violated when the prosecutor referred to Petitioner's silence during the trial in her closing argument.[10]  (Pet'r's Br. in Supp. of Pet. at 34, 49-50, docket #2.)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that

_____

[10]Petitioner raised all of his ineffective assistance of counsel claims in his motion for relief from judgment except for the claim stated above in (ii).  Petitioner also attached Declarations by his appellate attorneys, Brian Shannon and David Griem, which discussed several ways the appellate attorneys rendered ineffective assistance of counsel in Petitioner's case, to his motion for relief from judgment.  (*See* Mem. in Supp. of Mot. to Lift Stay at 4, docket #9; Exs. to Appellant's Application for Leave to Appeal to Mich. Supreme Court, docket #44.)  Further, this Court permitted Petitioner to supplement his application for habeas corpus relief with the Declarations.  (*See* May 4, 2007 Order at 2, docket #11.)

counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

When deciding ineffective-assistance claims, courts need not address both components of the inquiry "if the defendant makes an insufficient showing on one." *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

### 1.     Failure to Challenge the Age of Mariana Slicker

Petitioner claims that (i) his trial counsel was ineffective for failing to argue at trial that Mariana Slicker was thirteen years old at the time of the alleged crime,[11] and (ii) his appellate and trial counsels were ineffective for failing to move for a new trial based on the same argument. (Pet'r's Br. in Supp. of Pet. at 34, 49-50, docket #2.) As stated above in Section III(B), Petitioner alleges that Mariana was thirteen years old during the second assault, which resulted in the first-degree CSC conviction. (Pet'r's Br. in Supp. of Pet. at 34, docket #2.) Because the ineffective of assistance of counsel arguments are similar, this Court will consider them together.

---

[11]Petitioner raised his first argument in his motion for relief from judgment, which the trial court held was procedurally defaulted. (*See* Sept. 5, 2006 Macomb County Circuit Court Op. & Order at 4, docket #43.) As stated in footnote 4, *supra*, this Court will consider the merits of Petitioner's claims.

Petitioner only presented his second argument on direct appeal. As to his second claim, the Michigan Court of Appeals concluded that trial counsel and appellate counsel's failure to move for a new trial was not ineffective assistance of counsel:

> In a related argument, [Petitioner] asserts that his trial attorney was ineffective for failing to move for a new trial on the basis that the great weight of the evidence did not support his conviction. [Petitioner] also argues that his appellate attorneys were similarly ineffective for failing to raise the issue in an appropriate motion.

> To prove ineffective assistance of counsel, a defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness and that the defendant was so prejudiced that he was deprived of a fair trial. *Strickland v. Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v. Pickens*, 446 Mich 298; 521 NW2d 797 (1994); *People v. Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). Because [Petitioner] did not move for a *Ginther* hearing, our review of this issue is limited to mistakes apparent on the record. *People v. Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002).

> The record does not indicate why [Petitioner's] attorneys failed to contest the weight of the evidence in an appropriate motion. Furthermore, as we have already determined, the jury was in a better position to judge the credibility of the trial witnesses. The trial judge may not sit as a "thirteenth juror" to veto the jury's verdict. *Lemmon*, *supra* at 636. Considering the trial court's limited role in reviewing the jury's determination of credibility, we cannot say that a motion for new trial on this ground would have been successful. Therefore, [Petitioner] has not established that he was prejudiced by his attorneys' failures to raise this issue.

(MCOA Op. at 6-7, docket #40) (footnote omitted.)

The trial court's conclusion was a reasonable application of the prejudice component of *Strickland*. In both of his ineffective assistance of counsel claims, Petitioner is essentially arguing that there was insufficient evidence to support his conviction for first-degree CSC with a child, to wit Mariana Slicker, under thirteen years old. This Court considered Petitioner's insufficiency of the evidence claim in Section III(B). As previously discussed, Mariana Slicker testified that she was twelve years old when Petitioner digitally penetrated her vagina. (Tr. II, 45-46, 56.)

Petitioner's wife and daughter's testimony placed the sexual assault in the spring of 1995, when Mariana would have been thirteen years old. (Pet'r's Br. in Supp. of Pet. at 46, docket #2; Tr. VIII, 32, 196-98.) As correctly stated by the Michigan Court of Appeals, questions of witness credibility are for the jury. *See Herrera*, 506 U.S. at 401-02. Interestingly enough, Petitioner's attorney emphasized in his closing argument that "[t]he reasonable doubt in this case is beyond any thought process, it is complete doubt, from the credibility of the stories *to the dates[,] which are refuted by the documentation[s]* . . . . The case lacks credibility." (Tr. IX, 75-76) (emphasis added.) Under the circumstances, the state court's determination that Petitioner had failed to demonstrate the necessary prejudice constituted a reasonable application of Supreme Court precedent. Petitioner's habeas claims therefore fail.

### 2.        References to Petitioner's Silence

In his sixth, seventh and eighth grounds for habeas corpus relief, Petitioner argues that (i) his appellate counsel was ineffective when counsel failed to seek a remand to expand the trial record regarding the ineffective assistance of counsel arguments; (ii) his trial and appellate counsel were ineffective because they failed to sufficiently argue a Fourteenth Amendment violation when the prosecutor used Petitioner's silence, after his arrest and *Miranda* warnings, as evidence in the trial; and (iii) his trial and appellate counsel were ineffective because they did not argue that Petitioner's Fifth Amendment right against self incrimination was violated when the prosecutor referred to Petitioner's silence during the trial in her closing argument. (Pet'r's Br. in Supp. of Pet. at 34, 49-50, docket #2.) Petitioner raised all of the arguments in his motion for relief from judgment. In rejecting Petitioner's arguments, the trial court provided:

> [Petitioner] presently raises the following arguments: . . . (3) he was denied
> effective assistance of appellate counsel inasmuch as appellate counsel failed to seek

a remand to expand the record regarding the ineffective assistance of trial counsel arguments; (4) he was denied effective assistance of trial and appellate counsel because they failed to sufficiently argue a Fourteenth Amendment violation when the prosecutor used his silence after his arrest and receipt of *Miranda* warnings as reasons to find him guilty; and (5) he was denied effective assistance of trial and appellate counsel on the ground that they failed to argue that his Fifth Amendment right against self-incrimination was violated when the prosecutor referred to his silence during closing argument.

\*\*\*

Ineffective Assistance of Trial Counsel

\*\*\*

In any event, the Court notes that the fourth and fifth arguments arise from counsel's alleged failure to object to the prosecutor's reference to [Petitioner's] silence. The Court has already found above that such reference was addressed by the Court of Appeals. Since the appellate court held that the reference was cured by a jury instruction, trial counsel's failure to raise any objections thereto would not have had any impact on the outcome. The Court is satisfied that [Petitioner] has failed to establish ineffective assistance of counsel, as set forth under *Tommolino, supra,* and *Strickland, supra.*

Ineffective Assistance of Appellate Counsel

Finally, [Petitioner's] third, fourth, and fifth arguments address, in whole or in part, ineffective assistance of appellate counsel. In his third argument, [Petitioner] maintains that appellate counsel failed to seek a remand for the purpose of developing the record as to his position that he was denied []effective assistance of trial counsel. He submits that a remand would have afforded him an opportunity to establish that trial counsel's conduct had not constituted sound trial strategy. However, the Court is convinced that [Petitioner] has failed to show that counsel's conduct prejudiced him, especially in light of the appellate ruling that this Court had not abused its discretion in denying his motion for a mistrial.

Further, the fourth and fifth arguments go to the prosecutor's comments about [Petitioner's] silence. Inasmuch as this issue has been adequately discussed above, the Court need not address it again. It is sufficient to hold that such ground does not provide a basis for relief.

(Sept. 5, 2006 Macomb County Circuit Court Op. & Order at 2, 4-5, docket #43.)

The trial court's conclusions were not an unreasonable application of *Strickland*. With respect to Petitioner's ineffective assistance of counsel claims based on counsels' failure to argue Fifth Amendment and Fourteenth Amendment violations for the use of Petitioner's silence, Petitioner was not prejudiced because the trial court's curative instruction was adequate to ameliorate any prejudice as stated in Section III(A)(1)-(2). In its jury instructions, the trial court specifically mentioned to the jury that they should not consider Petitioner's failure to contact the police or prosecutor's office after Detective Deprez' initial investigation. (Tr. IX, 119.) Further, the evidence against Petitioner was strong. Among other things, the two victims testified as to Petitioner's sexual assaults, and multiple other witnesses corroborated the victims' testimony. Petitioner therefore fails to demonstrate a reasonable probability that, but for counsels' alleged errors, the result of the proceeding would have been different. Accordingly, Petitioner is not entitled to habeas corpus relief on his claims that trial and appellate counsels were constitutionally ineffective for failing to argue Fifth Amendment and Fourteenth Amendment violations for the use of Petitioner's silence. Because I find that all of Petitioner's ineffective assistance of counsel claims fail, Petitioner's allegation that his appellate counsel was ineffective for failing to file a motion for remand to develop the record necessarily fails.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date: August 13, 2009                          /s/ Ellen S. Carmody
                                               ELLEN S. CARMODY
                                               United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fᴇᴅ. R. Cɪᴠ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).